**Voula ERIS, Appellant,**

v.

**Don PHARES, Appellee.**

**No. 01–98–01218–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 22, 2001.

Shawn Casey, Houston, for appellant.

Joe H. Rentz, Houston, for appellee.

Panel consists of Justices COHEN, JENNINGS, and DUGGAN.*

## OPINION

DUGGAN, Justice (Retired).

This is an appeal from a judgment (1) finding that appellant, Voula Eris, and appellee, Don Phares, were married by January 30, 1997, (2) granting them a divorce, (3) dividing the marital estate, and (4) setting aside a January 30, 1997 transfer of real property from Phares to Eris. Eris asserts five points of error. We reverse the judgment and remand to the trial court.

### Facts

The parties met at a club in June or July 1995 and began to date regularly. Phares was recently divorced, and Eris was a single mother.

Phares testified that the relationship became intimate; that Eris moved into his home within several weeks, bringing her cosmetics, clothing, and personal effects; that she did not return to her own home with any regularity; and that he could not recall a night after she moved in when she slept at her old residence.

Eris admitted that she spent the night with Phares and traveled with him, but denied that she moved in with him. She testified that during their relationship David Lane (an employee and a witness for Phares) and another man lived in Phares's home; that Phares's son lived in back; and that she lived with her children in her house, where she also received her mail and kept her telephone and furniture. Both parties testified they went places to-

* The Honorable Lee Duggan, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

gether and had sexual relations and that Phares asked Eris to marry him within two to six months after they began dating.

According to Phares, Eris told him, "Baby, we don't have to get married to be married. You've had problems with your credit since your heart trouble. Let's get your debts straight and then we'll do it right." From this statement, Phares understood he and Eris were married, albeit not ceremonially. Phares stated he wanted to be married to Eris, agreed to marry her, and thought he was married to her. He testified she did not tell him she did not want to marry him; rather, she said she did not want to have a ceremony because she wanted to keep her own name to protect her credit. He testified she must have had some understanding of the legality of a common-law marriage because she said they were married. He testified she was present on several occasions when he represented to others that she was his wife and she did not deny they were married. He said he never bought her a ring because she said she did not want one. He admitted he did not have any documents to prove they were married and she did not change her name.

According to Eris, when Phares asked her to marry him, she made it clear she did not want to marry again. She denied he referred to her as his wife in her presence; instead, he called her "the Greek." She stated she refused the ring he offered her because she recognized it was a symbol of marriage and she did not want to marry.

The couple opened a joint bank account in January 1996. Eris testified Phares told her the IRS took his money anytime he had it in a bank account in his own name, so she agreed for her name to be on the account. Eris stated her name was on the bank papers establishing the account only and Phares had his name alone put on the checks.

During the relationship, Phares had financial problems. Specifically, he owed $18,000 in back taxes on his house and had difficulty making his house payment. Eris testified that she loaned him around $20,000 over the course of their relationship and that, on at least one occasion, he ran charges on her American Express card through his company to get money.

In August or September 1996, Phares began to talk to Eris about selling his home[1] to her. He testified an attorney suggested he put the house in her name. He stated Eris told him on several occasions that if the house were in her name he would not have to worry because it would always be his; that he relied on these assurances; and that he would not have put the house in her name if he had not believed it would always be his and he would get it back at some point.

Eris denied she influenced Phares to sell the house and stated that all her actions in connection with the house sale were at the direction of either Phares or his lawyer. She stated Phares owed her money and told her he would pay her and all his debts if she would buy the house.

On the day before the $21,500 seller's lien on Phares's house was to be foreclosed, Eris's daughter, Jackie, purchased the lien with funds Eris loaned her for that purpose. Later, Eris purchased the house from Phares and received a warranty deed describing her as a "single" person. At the closing on January 30, 1997, Eris' daughter's lien was paid. Eris borrowed $23,065.37 from the Bank of Houston to make the down payment on the house. The American Title Company settlement statement showed that Phares received $23,833.69 as a result of the sale. He endorsed his check to Eris, and she repaid the loan to Bank of Houston.[2] Phares

---

1. Phares was awarded the home in question in his divorce from his fifth wife. The decree states the home was his separate property.

2. Phares did not seek repayment of the $23,833.69. He asked only that the trial court set aside the warranty deed.

testified that as a result of the transaction between them, an IRS lien, the property taxes due on the house, and Eris's daughter's lien were all paid. Eris testified she also paid off a judgment against Phares in favor of his former divorce attorney.

Eris testified she and Phares did not agree before the closing that he would retain an interest in the house after she purchased it. In contrast, Phares testified they agreed he would pay the mortgage as he had before the transfer. Phares admitted that the settlement statement showed that he had no obligation on Eris's purchase money note to Bank of Houston. He testified he attempted to make the house payments after the transfer, but she would not let him; however, he could not recall whether she made mortgage payments out of their joint account. She testified, and he admitted on cross-examination, that he made no house payments after the sale until the trial court ordered him to do so in July 1997.

Phares testified that after he paid the back taxes, in February or March 1997, he first asked Eris to put the house title back in his name and that he repeated his request three or four more times. She would not, and she refused to allow his son in the house as well. Nonetheless, he testified, she continued to assure him the house would always be his.

The two separated in April 1997. Phares testified his "flag went up" when Eris would not let him make the house payments or allow his son in the home, so he asked her to leave. She left the night he asked her to, and she has not returned. He testified he trusted her and she set him up. Even though he acknowledged she was legally obligated to pay the house note and he was not, he maintained they orally agreed he would pay the note. He also admitted he still owes her $13,000 he borrowed from her during the marriage.

Each party introduced several witnesses who testified to their observations about the couple. Several of Phares's friends and employees testified they thought, for various reasons, the two were married. Rodney Miller testified that when he met them in October 1996, Phares introduced Eris as his wife and she did not indicate she disagreed. Miller also thought Eris was Phares's wife because her clothes were on the floor in the main bedroom. Further, Eris fixed Miller a drink and acted like a hostess.

Luke Ash, one of Phares's employees, testified that Eris lived with Phares and that Phares told him Eris was going to put the house in her name, but she wanted no part of it in return.

Wesley Pybus, another of Phares's employees, testified that Eris said she and Phares did not need to be married to be married. Pybus testified that the two lived together as man and wife; that he saw her clothing and other personal items, such as picture frames and furniture, at Phares's home; and that he, Pybus, heard her say on several occasions that the house belonged to Phares.

Dawn Currie, a Bank of Houston employee, met Eris when Phares brought her to the bank to open a joint account. Currie testified that nothing in the account paperwork indicated the two were married and neither ever referred to the other as husband or wife. Currie testified that Eris borrowed money from the bank to help Phares keep his house; she thought Eris was going to buy the house so Phares wouldn't lose it.

Ray Villalovas, Phares's neighbor, friend, and insurance agent of 10 years, testified that although Phares introduced Eris to him as his wife in Eris's presence, Eris never referred to Phares as her husband. Villalovas had meals with the two on several occasions, and Eris always "appeared to be" Phares's wife. Villalovas saw Eris's car in the driveway every morning and evening and thought she lived at Phares's home.

David Lane, Phares's employee and former tenant, testified that Eris began living

with Phares in July 1995. Lane also provided testimony about which Eris complains on appeal: that she told Lane one of her former employers had accused her of stealing.

Palmer Didion testified that the two appeared to be husband and wife; that he never heard either of them say they had agreed to be married; but that he heard Phares introduce Eris as his wife. Didion spoke with Eris about Phares's financial problems, and she told him she was going to help Phares refinance the house. Eris did not tell Didion she intended to make the house her own.

Eris stated that she never heard Phares refer to her as his wife in front of any of the witnesses who testified at trial and that she did not agree to be married to him and did not call him her husband. She presented several witnesses who testified they had met the couple and were not told the two were married. Georgia Charles testified she had cocktails with Phares and Eris on one occasion and neither indicated they were married. Charles LaFoon became friends with Eris after he met her at a bar where she worked. He visited the bar regularly and met Phares as well. On one occasion he spent several hours talking to Phares and Eris, and neither indicated they were married. George Risner testified he had been with Phares and Eris at several parties and they appeared to be close friends or boyfriend and girlfriend. Neither told him the couple was married. Finally, Jackie McCara met Phares and Eris in April or May 1997 when they met with McCara to discuss buying her business; at that time, they did not indicate they were married. McCara also talked with Phares several months later. During this telephone conversation, Phares told her he was not married and did not want to be married because he had just gone through a bitter divorce.

The jury found that (1) Phares and Eris were married before January 30, 1997, the date of the house conveyance transaction,

(2) grounds existed for divorce, (3) Eris committed fraud with respect to Phares's property rights in the house, and (4) the deed from Phares to Eris should be set aside. The trial court rendered judgment on the verdict.

## Sufficiency of the Evidence

In points of error two and three, Eris argues the evidence is legally and factually insufficient to support the jury's finding that she and Phares were married.

■ The three elements of a common-law marriage are (1) agreement to be married; (2) after the agreement, living together in Texas as husband and wife; and (3) representing to others in Texas that they are married. Tex.Fam.Code Ann. § 2.401(a) (Vernon Supp.2001); *In re Estate of Giessel*, 734 S.W.2d 27, 30 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). A common-law marriage does not exist until the concurrence of all three elements. *Winfield v. Renfro*, 821 S.W.2d 640, 645 (Tex.App.—Houston [1st Dist.] 1991, writ denied).

■ In reviewing a legal sufficiency of the evidence challenge, this Court must view the evidence in the light most favorable to the jury's verdict, considering only the evidence and inferences that support the finding and disregarding all other evidence and inferences. *Davis v. San Antonio*, 752 S.W.2d 518, 522 (Tex.1988); *Winfield*, 821 S.W.2d at 645.

■ In reviewing a factual sufficiency point, this Court must evaluate all the evidence and reverse the judgment only if the jury's finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Winfield*, 821 S.W.2d at 645. The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Winfield*, 821 S.W.2d at 645; *Rego Co. v. Brannon*, 682 S.W.2d 677, 680 (Tex.App.—Houston [1st Dist.] 1984, writ

ref'd n.r.e.). This Court may not substitute its opinion for that of the jury merely because we would have reached a different result. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634 (Tex.1986); *Winfield,* 821 S.W.2d at 645.

### a. Agreement to be married

In point of error two, Eris asserts Phares's evidence is legally and factually insufficient to support the jury's finding that she and Phares agreed to be married.

■ To establish this element of common-law marriage, the evidence must show the parties intended to have a present, immediate, and permanent marital relationship and that they did in fact agree to be husband and wife. *Winfield,* 821 S.W.2d at 645; *Rodriguez v. Avalos,* 567 S.W.2d 85, 86 (Tex.App.—El Paso 1978, no writ).

#### (1) Legal sufficiency

Eris first contends there is no evidence they agreed to be married.

■ Phares testified Eris told him they "didn't have to be married to be married" and that she did not want to take his name to protect her credit. After that conversation, he testified, he considered they were married. This testimony by Phares is more than a scintilla of direct evidence that the two agreed to be married. *Winfield,* 821 S.W.2d at 645; *see Collora v. Navarro,* 574 S.W.2d 65, 70 (Tex.1978) (direct testimony of the party of an agreement to be married was enough to raise the issue of agreement); *see also Giessel,* 734 S.W.2d at 32 (testimony of one party that they had agreed to be married "in God's eyes" was direct evidence of agreement to be married). We reject Eris's assertion that there is no evidence the parties agreed to be married.

#### (2) Factual sufficiency

■ Eris next urges that the evidence is factually insufficient to support a finding that they agreed to be married. Under the factual sufficiency challenge, we must consider all the evidence. *Cain,* 709 S.W.2d at 176; *Winfield,* 821 S.W.2d at 646.

In opposition to the finding that the two agreed to be married, Eris testified that she never intended to be married to Phares; that every time the subject of marriage came up, she told him she did not want to marry; that she did not live at his house, but kept a separate townhome where she lived with her children; that she agreed to have a joint bank account only because of his money problems; and that she did not wear a wedding ring. When Phares sold the house to Eris, the warranty deed he gave her stated she was a "single woman."

■ In support of the finding that the two agreed to be married, Phares presented evidence that Eris moved into his home shortly after they began dating; that she kept a few items of furniture, her clothing, and her personal items there; that she slept at his home every night; and that the two lived as if they were married. Several of his friends and employees testified they considered the couple to be married and Eris acted like Phares' wife when they were in Phares's home.

■ Evidence of an agreement to be married may be inferred from cohabitation and representations. *Winfield,* 821 S.W.2d at 645; *Giessel,* 734 S.W.2d at 32. Considering the totality of this evidence, we hold it to be factually sufficient to support a finding of an agreement to be married. We overrule point of error two.

### b. Holding out

In point of error three, Eris urges the evidence is legally and factually insufficient to support the jury's finding that she and Phares held themselves out to the public as married.

■ To satisfy this element of common-law marriage, parties must, in Texas, have represented to others that they were married. Tex.Fam.Code Ann. § 2.401(a)(2). The statutory requirement of "represented

to others" is synonymous with the judicial requirement of "holding out to the public." *Winfield,* 821 S.W.2d at 648; *Giessel,* 734 S.W.2d at 30. It is well settled that "holding out" may be established by conduct and actions of the parties. *Winfield,* 821 S.W.2d at 648; *Giessel,* 734 S.W.2d at 31. Spoken words are not necessary to establish representation as husband and wife. *Winfield,* 821 S.W.2d at 648; *Associated Indem. Corp. v. Billberg,* 172 S.W.2d 157, 164 (Tex.App.—Amarillo 1943, no writ). Because the jury question asks only if the elements existed before January 30, 1997, the date Eris bought Phares's house, we will consider only evidence of this element occurring before that date.

Eris contends that Phares's occasional introductions of her as his wife amounted to no evidence of holding out that they were married. She relies on *Winfield v. Renfro* as support. Phares counters that Eris acquiesced in being identified as his wife and argues that his witnesses at trial testified the couple acted as husband and wife.

In *Winfield,* we held that occasional introductions as husband and wife do not establish the element of holding out; the two introductions as husband and wife in that case were simply not enough. 821 S.W.2d at 651. We recognized that, in *Ex parte Threet,* 160 Tex. 482, 333 S.W.2d 361, 364 (1960), the Supreme Court of Texas held that evidence that a couple were introduced as husband and wife to a few friends was no evidence that they held themselves out as married. *Id.* In contrast, in *Giessel,* the couple had the reputation in the community for being married even though they had kept the marriage a secret from a few family members. *Id.* (citing *Giessel,* 734 S.W.2d at 31). All three cases turned on whether the couple had a reputation in the community for being married. *Threet,* 333 S.W.2d at 364; *Winfield,* 821 S.W.2d at 651; *Giessel,* 734 S.W.2d at 31.

### (1) Legal Sufficiency

■ Here, several of Phares's friends and employees testified they thought the couple was married because they lived together and acted as if they were married. Phares also testified he introduced Eris as his wife and she never contradicted him. This is more than a scintilla of evidence that the two represented to others in Texas that they were married. We reject Eris's legal sufficiency challenge.

### (2) Factual Sufficiency

■ Under Eris's factual sufficiency challenge to "holding out," we must consider all of the evidence. In contrast to the evidence set out above, Eris presented several witnesses who testified they were never told the couple was married. Georgia Charles testified she had cocktails with Phares and Eris on one occasion and neither indicated they were married. Charles LaFoon became friends with Eris after he met her at a bar where she worked. He visited the bar regularly and met Phares as well. On one occasion, he spent several hours talking to Phares and Eris. Neither told him the couple was married, and he did not think they acted like they were. George Risner testified he had been with Phares and Eris at several parties and they appeared to be close friends or boyfriend and girlfriend. Neither introduced the other as a spouse or mentioned they were married. Finally, Jackie McCara met Phares and Eris in April or May 1997 when they met with her to discuss buying her business; at that time, they did not indicate they were married. McCara also talked with Phares several months later. During this telephone conversation, Phares told her he was not married and did not want to be married because he had just gone through a bitter divorce.

Further, when Phares transferred his home to Eris on January 30, 1997, the warranty deed described Eris as a "single person." Dawn Currie, an employee of the Bank of Houston, met Eris when Phares brought her in to open a joint account. Currie testified that nothing in the account paperwork indicated Phares

and Eris were married and neither referred to the other as husband or wife or represented they were married. No witness at trial testified that Eris ever introduced Phares as her husband or that the couple had a reputation in the community for being married.

Phares's witnesses also testified regarding their observations of the couple. The following table summarizes the testimony of these witnesses on the matter of the couple "holding out" to the public they were married:

| Witness and Relationship to Phares | Synopsis of Evidence |
| --- | --- |
| Rodney Miller, friend | On one occasion Phares, introduced Eris as his wife, and she made no objection. He saw her clothes on the floor in the master bedroom of Phares's house. The house seemed to show signs of a "woman's touch." |
| Wesley Pybus, employee | It appeared to him they lived together as man and wife. Eris told him she and Phares did not have to be married to be married, which he took to mean the couple was living together. |
| Ray Villalovas, neighbor | He thought there was one occasion where Phares introduced Eris as his wife in her presence. It appeared to him Eris acted like Phares's wife on the five to seven times he saw the couple together. It appeared they were living together because her car was at the house late at night and early in the morning. |
| David Lane, friend | The couple lived together, and he observed what he considered to be a husband/wife relationship. |
| Palmer Didion, friend | He formed the opinion Phares and Eris were married based on his experience as a lawyer who handled many family law cases. He heard Phares introduce Eris as his wife on one occasion. She seemed to play the role of wife. |
| Luke Ash, employee | Eris kept clothing at Phares's house and slept there. Eris would answer the door when Ash went to the house in the morning and was usually getting ready to go to work. |

Phares apparently told only a handful of friends he and Eris were married. The record does not indicate Eris ever did so, except for her statement to Wesley Pybus that she and Phares "did not need to be married to be married."

Further, none of the documents from the couple's joint bank account or the closing transaction on the transfer of the home from Phares to Eris indicated they were married. The fact that the house is the one piece of property at dispute renders the parties' conduct in connection with its transfer particularly significant, especially with respect to the element of "holding out." The warranty deed, to which Phares swore before a notary public and signed on January 30, 1997, in bold capital letters, conveyed the house to "VOULA ERIS, A SINGLE PERSON." [3]

Considering all the evidence, we hold the evidence was factually insufficient to support the required element of common-

3. We note that if Phares believed he was married to Eris, but swore before a notary public he was not, he committed perjury, a Class A misdemeanor. TEX.PENAL CODE ANN. § 37.02 (Vernon 2000).

law marriage that Phares and Eris represented to others that they were married before January 30, 1997. We sustain point of error three.

## Remaining Points of Error

 While our ruling on point of error three is dispositive of the appeal, the error asserted in point of error one could itself require reversal if it were to recur on retrial. In point of error one, Eris argues the trial court erred when it admitted the testimony of David Lane, over her timely objection that the evidence was irrelevant, that Eris had been fired from a job because her employer had accused her of stealing. This testimony constituted "[e]vidence of other crimes, wrongs, or acts … not admissible to prove the character of a person in order to show action in conformity therewith." TEX.R. EVID. 404(b). Further, the testimony wrongfully impeached Eris's credibility under Rules 608 and 609 by referring to a specific instance of her misconduct other than conviction for a felony or a misdemeanor involving moral turpitude. Indeed, Phares's counsel acknowledged the sole reason for offering the testimony was to show that Eris was more likely to have defrauded Phares because she had acted dishonestly in the past. Because the resolution of the question regarding whether Eris and Phares were married depended on the credibility of the parties, admission of this testimony could not have been harmless error. We sustain point of error one.

In point of error four, Eris complains the trial court's instruction to the jury to consider the fiduciary relationship between spouses when answering the jury questions was an improper comment on the weight of the evidence because whether the marriage existed was disputed. In point of error five, Eris asks this Court to reverse the trial court's award of attorney's fees to Phares. Because we sustain points of error three and one, we need not consider these points.

## Conclusion

We reverse the judgment and remand the cause to the trial court.