*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*


★   ★   ★      ★   ★   ★

# OPINION

No. 04-09-00410-CV

Jamie **CRENSHAW**,
Appellant/Cross-Appellee

v.

**KENNEDY WIRE ROPE & SLING COMPANY** and Newco Manufacturing Company, Inc.,
Appellees/Cross-Appellants

From the 229th Judicial District Court, Duval County, Texas
Trial Court No. DC-07-172
Honorable Alex William Gabert, Judge Presiding

Opinion by:   Phylis J. Speedlin, Justice

Sitting:   Sandee Bryan Marion, Justice
Phylis J. Speedlin, Justice
Marialyn Barnard, Justice

Delivered and Filed: June 30, 2010

AFFIRMED IN PART; REVERSED AND REMANDED IN PART

Jamie Crenshaw appeals a take-nothing judgment rendered against her, arguing the trial court

erred in submitting its jury instruction on common law marriage, and that such instruction was

harmful.  In a cross-appeal, Kennedy Wire Rope & Sling Company and Newco Manufacturing

Company, Inc. complain the trial court erred in denying their motions for directed verdict on the

issues of common law marriage and products liability.  We must decide whether the jury instruction

on common law marriage was an improper comment on the weight of the evidence and, if improper,

whether it was harmless because the defendants were entitled to directed verdicts on the holding out element of common law marriage and on the issue of liability.

## BACKGROUND

David Goehring was fatally injured while working as a floorhand on a drilling rig operated by his employer Helmerich & Payne International Drilling Company ("H&P"). Goehring was moving two casing bails with the use of a braided wire rope sling. The sling was attached to the bail by a sliding choker hook while the other end was connected to the hoist on the rig. The accident occurred when the bails disengaged from the sling and struck Goehring. Goehring's parents filed a wrongful death suit against the manufacturer of the sling, Kennedy Wire Rope & Sling Company ("Kennedy") as well as the manufacturer of the sliding choker hook, Newco Manufacturing Company, Inc. ("Newco"), alleging that the sling and hook were defectively designed. Jamie Crenshaw intervened in the death action, alleging she was Goehring's common law wife. Goehring's parents subsequently settled with Kennedy and Newco, leaving Crenshaw's claims to proceed to trial.

At trial, the issue of whether a common law marriage existed between Crenshaw and Goehring was strongly contested. At the close of the evidence, Newco and Kennedy moved for directed verdict on the issues of common law marriage and products liability. The trial court denied the motions for directed verdict and submitted the case to the jury. The first question in the court's charge related to the issue of common law marriage and was submitted as follows:

> Were Jamie Crenshaw and David Goehring married at the time of David Goehring's death?
>
> A man and a woman are married if they agreed to be married and after the agreement they lived together in Texas as husband and wife and represented to others that they were married.

*Represented to others means that both Jamie Crenshaw and David Goehring represented to other people that they were married. Mere isolated references to each other as husband and wife does not amount to adequate evidence to prove that they represented to others that they were married.*

(Emphasis added). Crenshaw objected to the italicized portion of the charge on the grounds that the instruction: (1) submitted language that does not appear in the statutory definition of common law marriage; (2) improperly embellished a statutory claim with unnecessary language despite the Texas Supreme Court having repeatedly held that trial courts should submit statutory claims in the statutory language; (3) contained incorrect statements of law; (4) improperly characterized certain evidence as only amounting to "mere isolated references;" (5) had not been approved as a proper submission by any Texas court or the Pattern Jury Charge Committee of the State Bar of Texas; and (6) constituted a direct comment on the weight of the evidence.

The jury answered "No" to the question of whether Crenshaw and Goehring were married, and therefore did not answer the remaining questions related to liability, proportionate responsibility, and damages. The trial court entered a take-nothing judgment against Crenshaw, and she timely appealed.

## I. JURY CHARGE ON COMMON LAW MARRIAGE

On appeal, Crenshaw contends the trial court erred in submitting the instruction on common law marriage, and that such instruction was harmful because it impermissibly tilted or nudged the jury toward a finding against Crenshaw on the existence of a common law marriage.

### A. *Applicable Law and Standard of Review*

Rule 277 of the Texas Rules of Civil Procedure states:

In all jury cases the court shall, whenever feasible, submit the cause upon broad-form questions. The court shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict.

. . .

> The court shall not in its charge comment directly on the weight of the evidence or advise the jury of the effect of their answers, but the court's charge shall not be objectionable on the ground that it incidentally constitutes a comment on the weight of the evidence or advises the jury of the effect of their answers when it is properly a part of an instruction or definition.

TEX. R. CIV. P. 277. A jury instruction is proper if it: (1) assists the jury; (2) accurately states the applicable law; and (3) is supported by the pleadings and evidence. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855-56 (Tex. 2009). Rule 277 affords the trial court considerable discretion in deciding what instructions are necessary and proper. *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 451-52 (Tex. 1997); *GuideOne Lloyds Ins. Co. v. First Baptist Church of Bedford*, 268 S.W.3d 822, 836 (Tex. App.—Fort Worth 2008, no pet.). In fact, a trial court is afforded even more discretion when submitting instructions than when submitting jury questions. *GuideOne Lloyds*, 268 S.W.3d at 836-37; *Wal-Mart Stores, Inc. v. Middleton*, 982 S.W.2d 468, 470 (Tex. App.—San Antonio 1998, pet. denied).

We review the trial court's decision to submit a particular jury instruction for an abuse of discretion. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006) (per curiam); *Star Enterprise v. Marze*, 61 S.W.3d 449, 456 (Tex. App.—San Antonio 2001, pet. denied). A trial court abuses its discretion when it acts arbitrarily, unreasonably, or without reference to any guiding principles. *Middleton*, 982 S.W.2d at 469-70; *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). An erroneous instruction, however, does not require reversal if it did not cause the rendition of an improper judgment. TEX. R. APP. P. 44.1(a) ("No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of . . . probably caused the rendition of an improper judgment."); *Star Enterprise*, 61

S.W.3d at 456. Charge error is generally considered harmful if it relates to a contested, critical issue. *Columbia*, 284 S.W.3d at 856. We review the entire record to determine whether the submission or refusal to submit an instruction probably resulted in an improper judgment. *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 756 (Tex. 1998).

## B. *Discussion*

In Texas, a common law marriage has three requirements: (1) the parties agreed to be married; (2) the parties lived together in Texas as husband and wife after they agreed to be married; and (3) the parties represented to others that they were married. TEX. FAM. CODE ANN. § 2.401(a)(2) (Vernon 2006); *Russell v. Russell*, 865 S.W.2d 929, 932 (Tex. 1993); *Palacios v. Robbins*, No. 04-02-00338-CV, 2003 WL 21502371, at *3 (Tex. App.—San Antonio Jul. 2, 2003, pet. denied) (mem. op.)

Crenshaw first argues the trial court erred in failing to submit a statutory claim in language tracking the statute; in other words, he asserts the submission on common law marriage did not track section 2.401 of the Family Code "as closely as possible." TEX. FAM. CODE ANN. § 2.401(a)(2); *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994) ("When liability is asserted based upon a provision of a statute or regulation, a jury charge should track the language of the provision as closely as possible."). Second, Crenshaw contends the "mere isolated references" instruction amounted to an improper comment on the weight of the evidence. *See Acord v. General Motors Corp.*, 669 S.W.2d 111, 116 (Tex. 1984) (charge should not be embellished with surplus instructions that tend to lead the jury toward a particular answer or suggest the trial court's opinion on the matter); *Lemos v. Montez*, 680 S.W.2d 798, 801 (Tex. 1984) (even a correct statement of the law should not be submitted if the instruction comments on the weight of the evidence or

impermissibly tilts or nudges the jury one way or the other). Crenshaw takes particular offense to the addition of the word "mere" to modify the phrase "isolated references," which she contends is already an inappropriate embellishment. *See Lemos*, 680 S.W.2d at 801 (instruction advising jury that "mere happening of a collision is not evidence of negligence" was an impermissible comment that tilted or nudged the jury one way or the other).[1]

In response, Kennedy and Newco initially contend that the instruction did track the Family Code and that there was no error in deviating from the pattern jury charge by adding a definition or instruction. *See Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 45-46 (Tex. 2007); *see also H.E. Butt Grocery Co. v. Bilotto*, 985 S.W.2d 22, 23 (Tex. 1998) (trial courts have broad discretion to add definitions to a pattern jury charge that has not been declared the exclusive method of charging a jury in Texas); *Whiteside v. Watson*, 12 S.W.3d 614, 623-24 (Tex. App.—Eastland 2000, pet. denied) (same).

Additionally, both defendants assert the particular paragraph at issue was proper because it (1) assisted the jury, (2) accurately stated the law, and (3) was supported by the pleadings and evidence. *See* TEX. R. CIV. P. 277, 278; *Columbia*, 284 S.W.3d at 855-56. Kennedy argues that because the instruction was an accurate statement of the law, it necessarily helped the jury. In support of this argument, Kennedy cites nine Texas cases for the proposition that isolated or occasional references to "husband" or "wife," without more, are no evidence of holding out. *See Estate of Claveria v. Claveria*, 615 S.W.2d 164, 166 (Tex. 1981) (when two persons not living

---

[1] Kennedy argues Crenshaw failed to preserve her jury charge complaints for appellate review. We disagree. Crenshaw made the trial court aware of her complaints by objecting to the challenged language as a direct comment on the weight of the evidence, an incorrect statement of the law, and an improper embellishment that was inconsistent with the pattern jury charge; she also requested a proposed instruction that tracked the statute and pattern jury charge. Accordingly, Crenshaw preserved error. *See* TEX. R. CIV. P. 278; TEX. R. APP. P. 33.1(a); *see also State Dept. of Highways v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992); *Green Tree Fin. Corp. v. Garcia*, 988 S.W.2d 776, 780-81 (Tex. App.—San Antonio 1999, no pet.).

together occasionally refer to each other as a "spouse," these isolated references do not establish a common-law marriage); *Ex parte Threet*, 160 Tex. 482, 333 S.W.2d 361, 364 (1960) (introduction of defendant as her "husband" to two close friends, and telling three others they were married, constituted no evidence of holding out to the public as man and wife where couple did not live together, and she publicly represented herself as single); *Drummond v. Benson*, 133 S.W.2d 154, 160 (Tex. Civ. App.—San Antonio 1939, writ ref'd) (isolated references to each other as "husband" and "wife" did not establish a common law marriage where couple lived together only intermittently and did not use the same last name); *Nichols v. Lightle*, 153 S.W.3d 563, 571 (Tex. App.—Amarillo 2004, pet. denied) (summary judgment affidavits showing, at most, only isolated references to each other as husband and wife, did not raise a genuine question of fact on the holding out element of common law marriage); *Lee v. Lee*, 981 S.W.2d 903, 907 (Tex. App.—Houston [1st Dist.] 1998, no pet.) (woman's introduction of man as her "husband" to two close friends, and telling a few customers and friends they were secretly married, constituted no evidence that *both* persons held themselves out to the public as man and wife); *Flores v. Flores*, 847 S.W.2d 648, 653 (Tex. App.—Waco 1993, writ denied) (where couple had been married and divorced, man's reference after divorce to his "wife" and statement that he was "living with my wife and helping her out" was insufficient to support a finding of holding out and agreement to re-marry); *Winfield v. Renfro*, 821 S.W.2d 640, 651 (Tex. App.—Houston [1st] Dist. 1991, writ denied) (occasional introductions as husband and wife, without having reputation in the community of being married, did not establish element of holding out); *In re Estate of Giessel*, 734 S.W.2d 27, 31 (Tex. App.—Houston [1st] Dist. 1987, writ ref'd n.r.e.) (references to each other as "husband" and "wife" were not the only evidence of holding out where record was replete with evidence of couple's conduct and reputation in

community representing they were married); *Gary v. Gary*, 490 S.W.2d 929, 934 (Tex. Civ. App.—Tyler 1973, writ ref'd n.r.e.) (occasional references to "husband" and "wife" did not support finding of holding out where couple were not sure they were divorced from previous marriage).

Kennedy and Newco further argue that *if* the instruction was a comment on the weight of the evidence, it was only incidental. To constitute a comment on the weight of the evidence, the instruction must indicate the trial judge's opinion on the truth of the matter in question. *Harris v. General Motors Corp.*, 924 S.W.2d 187, 188 n.1 (Tex. App.—San Antonio 1996, writ denied); *Maddox v. Denka Chem. Corp.*, 930 S.W.2d 668, 671 (Tex. App.—Houston [1st Dist.] 1996, no writ). An incidental comment on the evidence is not error. TEX. R. CIV. P. 277; *Harris*, 924 S.W.2d at 188 n.1. Here, Kennedy asserts the instruction merely tracked the holdings in case law, and did not tell the jury to give more weight to particular evidence over other evidence. Kennedy points to *Lewis v. Anderson*, 173 S.W.3d 556 (Tex. App.—Dallas 2005, pet. denied), as an analogous case on the issue of the existence of an informal marriage. In *Lewis*, the appellant objected to the following jury instruction:

> You are instructed that proof of an agreement to be married may be established by circumstantial evidence or the conduct of the parties. Proof of cohabitation and representation to others that the couple are married may constitute circumstantial evidence of an agreement to be married.

*Id.* at 564. The Dallas court noted the instruction quoted directly from *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993), and was a correct statement of the law. *Id.* at 565. The court further held that, "[t]o the extent the instruction commented on the evidence, it did so only incidentally and did not suggest the trial court's opinion concerning the issue." *Id.* Moreover, the Dallas court concluded the instruction was "helpful" to the jury. *Id.* (citing *Louisiana-Pacific Corp. v. Knighten*, 976 S.W.2d 674, 676 (Tex. 1998)).

We reject each of the arguments made by Kennedy and Newco. First, contrary to the impression created by the challenged language "mere isolated references," there is no bright-line quantitative test for what constitutes sufficient evidence of holding out to others. All of the cases relied on by the defendants, and referenced *supra*, apply a very fact-specific analysis to determine whether the holding out element of a common law marriage has been proven under the particular facts and circumstances of the case. *See*, *e.g.*, *Threet*, 333 S.W.2d at 364; *Drummond*, 133 S.W.2d at 160; *Winfield*, 821 S.W.2d at 651; *Giessel*, 734 S.W.2d at 31. Further, the mere fact that an instruction is a correct statement of the law does not mean it should be included in the jury charge, and does not prevent it from being an improper comment on the weight of the evidence. *See Acord*, 669 S.W.2d at 116 (in closely contested case, instruction that singled out for the jury that General Motors was neither an insurer nor a guarantor of an accident-proof product was an impermissible comment on the case as a whole); *Maddox*, 930 S.W.2d at 671 (noting every correct statement of the law does not belong in the jury charge, and holding surplus instruction on duty tended to lead the jury to a particular answer and suggested judge's opinion on the issue).

Here, the challenged portion of the instruction on common law marriage, even if a correct statement of the law,[2] nudged the jury in a specific direction, and was more than an incidental comment on the weight of the evidence. The language used, "[m]ere isolated references to each other as husband and wife does not amount to adequate evidence to prove that they represented to others that they were married," constitutes a direct comment on one aspect of one element of the statutory claim of common law marriage on which the plaintiff had the burden of proof. *See Russell*, 865 S.W.2d at 932 (elements of common law marriage are agreement to marry, living together after

---

[2] We need not determine whether the challenged language was in fact a correct statement of the law.

agreement, and holding out).  By stating that a certain category of evidence "does not" constitute sufficient evidence, the instruction favored the defensive theory that there was no evidence on the element of holding out, and impermissibly indicated the trial judge's opinion on the issue.  *See Lemos*, 680 S.W.2d at 801 (explicit instruction that particular evidence, "the mere happening of a collision," *is not* evidence of negligence was materially different from instruction that particular evidence *does not necessarily imply* negligence, and was error).  The instruction in the instant case differs significantly from the instruction in *Lewis*, relied on by Kennedy, which made the permissive statement that certain categories of proof "may" constitute circumstantial evidence of an agreement to be married.  *See Lewis*, 173 S.W.3d at 564-65 (holding instruction was not a direct comment on weight of the evidence).  In contrast, the challenged language here instructed the jury that "mere isolated references" to each other as husband and wife "***does not*** amount to adequate evidence" of holding out, and thus directly commented on the weight of the evidence on that element of Crenshaw's claim in violation of Rule 277.

Because it amounted to a direct comment on the weight of the evidence on one element of the contested issue of common law marriage, we hold the trial court abused its discretion in submitting the challenged portion of the jury instruction.

## C. *Harm Analysis*

Having determined that the instruction was erroneous, we must now decide whether it probably caused the rendition of an improper judgment.  *See* TEX. R. APP. P. 44.1(a).  Crenshaw maintains the erroneous instruction was harmful because whether a common law marriage existed was a contested, critical issue at trial.  *See Columbia*, 284 S.W.3d at 856 (charge error is generally harmful if it relates to a "contested, critical issue").  The existence of a common law marriage was

the only question answered by the jury, and was extensively addressed in voir dire, in opening statements, by trial witnesses, and in closing arguments. In addition, Crenshaw asserts the following closing argument by defense counsel compounded the harm:

> If you look at the instruction on question one the very last sentence says mere isolated references to each other as husband and wife does not amount to adequate evidence. That's the Judge telling you that. Mere isolated references. One time, two times, ten times over the course of several years that just doesn't get it.

Crenshaw notes that in *Timberwalk*, the court held that an erroneous instruction constituted harmful error where "there was a vigorous dispute at trial" related to the instruction and counsel's closing argument "focused the jury's attention on the instruction and plainly misstated it." *Timberwalk*, 972 S.W.2d at 755-56. We conclude the erroneous instruction was harmful because it definitively instructed the jury that a certain category of evidence on a contested, critical element of common law marriage was flatly inadequate, and therefore impermissibly suggested the trial judge's opinion on the matter and nudged the jury toward a defensive theory. Moreover, the defendant's closing argument to the jury quoted above stressed the erroneous instruction and highlighted the idea that the instruction revealed the judge's opinion on the matter. Therefore, we conclude the submission of the erroneous instruction probably caused the rendition of an improper verdict. *See* TEX. R. APP. P. 44.1(a).

Kennedy and Newco argue that any error in the charge on common law marriage was necessarily harmless because their motions for directed verdict on common law marriage should have been granted. That argument is addressed below.

## II. CROSS-APPEAL: MOTIONS FOR DIRECTED VERDICT

Both Kennedy and Newco moved for directed verdict on the issues of common law marriage and products liability. The trial court denied the motions and submitted the case to the jury. On

cross-appeal, both defendants argue the trial court erred in failing to grant their motions for directed verdict on common law marriage because there is no evidence that Crenshaw was the common law wife of Goehring. As to liability, Newco argues the evidence conclusively established that its component hook did not fail, and that Newco was not in any way involved in the design of the integrated wire rope sling; therefore, it was entitled to a directed verdict. Kennedy argues it was entitled to a directed verdict on liability because there was no evidence that the integrated sling was defectively designed.

## A. *Standard of Review*

A directed verdict for a defendant may be proper in two situations: (1) when a plaintiff fails to present evidence raising a fact issue essential to the plaintiff's right to recover; and (2) when the plaintiff either admits or the evidence conclusively establishes a defense to the plaintiff's cause of action. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

We review a challenge to a trial court's denial of a motion for directed verdict the same as we would review a challenge to the legal sufficiency of the evidence. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). Under a legal sufficiency standard of review, we view the evidence in the light most favorable to the finding and indulge every reasonable inference that supports it. *Id.* at 822. We credit favorable evidence if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Id.* at 827. If there is more than a scintilla of evidence to support the finding, the legal sufficiency challenge fails. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). More than a scintilla of evidence exists "if the evidence 'rises to a level that would enable reasonable and fair-minded people

to differ in their conclusions.'" *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

## B.  *Common Law Marriage*

To determine whether Kennedy and Newco were entitled to a directed verdict on common law marriage, we examine each required element in turn.  *See* TEX. FAM. CODE ANN. § 2.401(a)(2).

### (1) *Agreement to Be Married*

To establish an agreement to be married, the evidence must show the parties "intended to have a present, immediate, and permanent marital relationship and that they did in fact agree to be husband and wife." *Eris v. Phares*, 39 S.W.3d 708, 714 (Tex. App.—Houston [1st Dist.] 2001, pet. denied).  The agreement to be married may be established by direct or circumstantial evidence. *Russell*, 865 S.W.2d at 933.  The unchallenged testimony of one of the parties to the marriage constitutes direct evidence the parties agreed to be married and amounts to more than a scintilla. *Eris*, 39 S.W.3d at 714 (citing *Collora v. Navarro*, 574 S.W.2d 65, 70 (Tex. 1978)); *Giessel*, 734 S.W.2d at 32.  The conduct of the parties as well as proof of cohabitation and representations to others may constitute circumstantial evidence of an agreement to be married depending upon the facts of the case.  *See Russell*, 865 S.W.2d at 933; *see also Eris*, 39 S.W.3d at 714.

Here, Crenshaw testified that three or four months after they started dating, she and Goehring agreed that they would be married.  Kennedy argues that this testimony is self-serving and uncorroborated.  Although Crenshaw's testimony was challenged by the defense, and contradicted by Goehring's family, friends, and coworkers, who testified that they believed Crenshaw to be Goehring's girlfriend, it is more than a scintilla of evidence of an agreement to be married.  We

conclude the evidence was legally sufficient to establish that Crenshaw and Goehring agreed to be married.

**(2)** *Cohabitation*

There was extensive evidence presented at trial that Crenshaw and Goehring lived together for almost two years prior to his death. Goehring moved into Crenshaw's duplex in Victoria in September 2005, and lived there until his death on June 18, 2007. Goehring worked seven days on and seven days off; on his days off, he lived at the duplex with Crenshaw. Cohabitation need not be continuous. *See Bolash v. Heid*, 733 S.W.2d 698, 699 (Tex. App.—San Antonio 1987, no writ) (holding evidence sufficient to establish cohabitation where husband worked in Nigeria but lived with wife each time he returned to Texas). Goehring kept his possessions, including clothing, vehicles, tools, furniture, guns, dishes, fishing gear, and other personal property at the duplex. Several witnesses, including Goehring's parents, testified that Crenshaw and Goehring were living together at the time of his death. The evidence was legally sufficient to establish that Crenshaw and Goehring lived together in Texas after they agreed to be married.

**(3)** *Holding Out*

Finally, to meet the third element of common law marriage, the parties must have represented to others in Texas that they were married. *Winfield*, 821 S.W.2d at 648. The statutory requirement of "represented to others" is synonymous with the judicial requirement of "holding out to the public." *Id.*; *Giessel*, 734 S.W.2d at 30. Holding out may be proven by evidence of the conduct and actions of the parties. *Eris*, 39 S.W.3d at 715; *Giessel*, 734 S.W.2d at 31. "Spoken words are not necessary to establish representation as husband and wife." *Winfield*, 821 S.W.2d at 648.

Here, Crenshaw and two witnesses testified regarding the element of holding out. Sara Pagil, Crenshaw's close friend, frequently stayed at the duplex and testified that the couple often referred to each other as "husband and wife," and Pagil considered them to be married. When people would ask where Goehring was, Crenshaw would answer, "Oh[,] my husband is over there." Pagil remembered one occasion when Crenshaw told Goehring to get out of the kitchen so she could cook dinner, and Goehring replied, "Man[,] my wife is mean."

Monty Hoffman, who lived across the street from the couple, testified that Crenshaw regularly referred to Goehring as her "husband" and he thought the couple was married. On one occasion, Goehring confronted him about a barbeque pit Hoffman had borrowed from Crenshaw without permission. Goehring told him, "Jamie [Crenshaw] is my wife and, whatever is hers is mine."

Crenshaw herself testified that once they decided to be married, she and Goehring both represented to others that they were husband and wife. Before making plans with others, Crenshaw would say, "I would have to speak with my husband." Likewise, Goehring would say, "he would have to speak to his wife," or that he would "need to get it approved with his wife first." Crenshaw also referred to a specific occasion in December 2005 or January 2006 when she and Goehring told his friends, John and Randy Becker, that they were married.

John Becker, however, refuted that statement, and testified there was no doubt in his mind that Crenshaw and Goehring were *not* married. In fact, all of the defense witnesses, including Goehring's family, friends, and coworkers, testified that Crenshaw and Goehring did not hold themselves out as husband and wife. Additionally, Pagil testified that Crenshaw told her that she and Goehring planned to get married. Kennedy and Newco assert that such a statement negates the

existence of a present informal marriage, because a couple cannot presently be married and also plan to marry in the future. Kennedy and Newco argue there is no evidence to show that Goehring believed he was married to Crenshaw, and that the couple's isolated references to each other as "husband" and "wife" were insufficient as a matter of law to establish that they held themselves out as married. *See Threet*, 333 S.W.2d at 364.

Crenshaw responds that even if the references were isolated, they were corroborated by the uncontroverted evidence that they agreed to be married and the overwhelming evidence of cohabitation. *See Russell*, 865 S.W.2d at 932-33; *see also Claveria*, 615 S.W.2d at 166. Considering the evidence in the light most favorable to Crenshaw, we conclude that reasonable and fair-minded people could differ in their determinations as to whether Crenshaw and Goehring held themselves out as husband and wife. *See City of Keller*, 168 S.W.3d at 827-28. There is certainly more than a scintilla of evidence—based on the testimony of Pagil, Hoffman, and Crenshaw—that the couple represented to others that they were married. Accordingly, we hold the trial court did not err in denying the defendants' motions for directed verdict, and correctly submitted the issue of common law marriage to the jury.

## C. *Products Liability*

To recover on her products liability claim alleging the integrated wire rope sling was defectively designed, Crenshaw had to prove that:

(1) the product was defectively designed so as to be unreasonably dangerous, taking into consideration the utility of the product and the risk involved in its use;
(2) there was a safer alternative design; and
(3) the defect was a producing cause of the injury or death in question.

TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(a) (Vernon 2005); *Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 256-57 (Tex. 1999). Kennedy and Newco moved for directed verdict on the issue of

liability, alleging that Crenshaw failed to present more than a scintilla of probative evidence on the first element of her claim for a defectively designed product. We address each motion for directed verdict in turn.

**(1)** *Newco's Motion*

Newco moved for directed verdict on the basis that the evidence conclusively established that its component hook did not fail, and that it was not in any way involved in the design of the integrated wire rope sling. Newco argues that, as a component-part manufacturer who did not participate in the integration of the hook into the sling, it is not liable for any defects in the sling if the hook itself was not defective. *See Bostrom Seating, Inc. v. Crane Carrier Co.*, 140 S.W.3d 681, 683 (Tex. 2004) ("if the component-part manufacturer does not participate in the integration of the component into the finished product, it is not liable for defects in the final product if the component itself is not defective."); *Willowbrook Foods, Inc. v. Grinnell Corp.*, 147 S.W.3d 492, 504 (Tex. App.—San Antonio 2004, pet. denied) (component part manufacturer that supplies a product according to purchaser's specifications is free from liability if component itself is not defective). Crenshaw contends there was sufficient evidence to establish that Newco's hook was defectively designed, or at least to raise a fact issue on the matter. Crenshaw relies on the testimony of Erica Ryles, Newco's manager, and the testimony of an expert witness Randy McClay, a petroleum engineering expert.

In determining whether the record contains any probative evidence to raise a fact issue on whether the hook itself was defective, we must look closely at the trial testimony cited by Crenshaw, viewing it in the light most favorable to her as the non-movant. *Bostrom*, 140 S.W.3d at 684 (citing

*Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001)).  The relevant portion of Ryles'

testimony is set forth below:

> Q.  And would you agree that ifs [sic] it is possible to use a safety latch on a hook that it should be used on a hook.
> A.  Yes.
> Q.  All right I mean it makes common sense to–that increases the safety of the hook doesn't it?
> A.  Yes, it does.
> Q.  Uh now you–Newco realizes that this hook without a latch is still going to be used in slings that lift objects over people's heads.
> A.  We can assume that that's what they are going to be used for, we don't know.
> Q.  You don't know but you want–you can assume it's going to happen and so as the manufacturer you need to plan for that.
> A.  Correct.
> Q  And the way you plan for that is to make it safe as possible.
> A.  Yes.
> Q.  And for it to be safe as possible when its's lifting loads over people's heads, it needs to have a safety latch on it doesn't it.
> A. Uh, yeah.
> A. And it doesn't, does it?
> A. No it does not.
> Q And you as Newco have known that you knew it before you ever sold it.
> A. That's correct.
> Q That in order to truly be safe it needed to have a safety latch on it.
> A. Yes.
> Q And you didn't do it.
> A. Yeah.
> . . .
> Q.  And when this hook without a safety latch is used on a cable as an assembly without a safety latch, you wouldn't recommend that this cable and assembly be used for work overhead would you?
> A. No
> Q. And that makes this whole thing defective doesn't it?
> A. I don't know if it does or doesn't
> Q. Well it's unreasonably dangerous isn't it because –
> A. If slack becomes in the line, yes.
> Q. And it could be – and it is unreasonably dangerous if slack gets in the line because it doesn't have a safety latch.
> A. That correct.
> Q. And if that's the definition the jury answers – is asked about defective, that makes that whole thing defective doesn't it?
> A. I would assume so.

Crenshaw argues that Ryles' testimony set forth above conclusively established that the Newco hook by itself was defectively designed. We disagree. Reading Ryles' testimony as a whole and in context shows that she was stating that the whole assembled product ("this cable and assembly"), *i.e.*, the braided wire rope sling with the Newco hook attached, was unreasonably dangerous for lifting loads overhead if slack got in the line. Ryles testified the Newco hook used by Kennedy was not equipped with a safety latch, and that a hook with a safety latch should have been used for lifting loads over people's heads in order for the whole integrated product (sling with the hook attached) to be as safe as possible. Ryles stated she would not recommend using the Newco hook without a safety latch "on a cable as an assembly" for work overhead. She further stated that "this whole thing" can be unreasonably dangerous if slack gets in the line. We read Ryles' testimony that the "whole thing" was defective under certain conditions, *i.e.*, slack in the line, as referring to the whole integrated product, not the Newco hook by itself. In addition, Ryles testified that Newco does sell the same size hook *with* a safety latch for use with a single wire rope, but not for use with the braided wire rope used by Kennedy. Finally, Ryles testified that one of Newco's competitors, Crosby, sells a hook equipped with a safety latch for use with braided wire rope.

In addition, Crenshaw relies on McClay's expert testimony explaining that because the Newco hook lacked a safety latch, the sling incorporating the hook was unreasonably dangerous when used with braided wire cable to lift loads overhead. Crenshaw maintains this evidence is sufficient to raise a fact issue on the first element of her design defect claim against Newco. However, McClay also testified that the Newco hook did not break or otherwise fail, and that the most likely cause of the accident was slack in the sling line which caused the thimble to come out

of the hook and the load to release. Specifically, when questioned about the Newco hook component, McClay testified in relevant part:

> Q. Do you have an opinion whether or not the Newco number 3 sliding choker hook that was installed on exhibit number 8 at the time of the accident, without a safety latch, was an appropriate piece of equipment for the job that was being done?
> A. I believe it was totally inappropriate for that particular job.
> [Expert testified about design defects and definition of "design defect," and "safer alternative design."]
> Q. Do you have an opinion whether or not per that definition, the–there was a design defect, uh, in the Newco number 3 choker hook that was a producing cause of the occurrence in question?
> A. Yes, sir.
> Q. And what is that opinion?
> A. I believe that there was a better design, a safer design of that particular sling, uh, we've heard testimony and I agreed with the testimony that if the hook had had a latch you would have prevented the slack condition from allowing it to come unhooked and I believe that is what caused this accident.

Again, reading McClay's testimony in context it is apparent that he was referring to the defective design of "that particular sling," the integrated product, not to the Newco hook by itself. Indeed, McClay testified that the hook itself was not *per se* defective, and did not fail. Further, McClay did not opine that the integrated wire rope sling was defectively designed for all purposes, but rather "was totally inappropriate for that particular job." McClay stressed that "there was a better design, a safer design of that particular sling," and that the integrated sling was misused in an inappropriate application. McClay conceded, however, that both the hook and sling were appropriate for certain applications. As noted in *Bostrom*, a component part which is not itself defective and is appropriate for certain other applications does not become "defective" simply because it was used in an inappropriate application. *Id.* at 683-84 (component seat which was not itself defective, and which "in another application, not the one on this vehicle, could work and perform under many

conditions well," was not defective as integrated into vehicle restraint system where manufacturer had no control over design of restraint system).

Viewing the above-quoted testimony in the light most favorable to Crenshaw, we do not agree that the testimony of Ryles and McClay raised a fact issue as to whether the Newco hook was defective in and of itself. Rather, both witnesses testified that the hook, *as integrated* into the wire rope sling by Kennedy, was part of a defectively designed "assembly," *i.e.*, the integrated product as a whole. As in *Bostrom*, Kennedy chose which hook it would use and integrated it into the design of the braided wire rope sling–Kennedy was "in total control" of the design of the sling, and Newco played no role in designing the sling. *See id.* at 684-85. We read Ryles' and McClay's testimony much like Newco does, meaning that both witnesses testified the issue was more one of misuse or inappropriate application of the hook than defective design of the hook itself. We conclude there is no evidence that the hook itself was defective, or that Newco participated in the integration of the hook into the final product; therefore, as a component-part manufacturer, it is not liable for any design defects in the wire rope sling. *See id.* at 683.

Because the evidence does not raise a fact issue as to whether the Newco hook was itself defective, and because there is no evidence that Newco participated in the integration of the hook into the final product, we hold that Newco cannot be held liable for the alleged defective design of the sling. *See id.* at 684. We therefore sustain Newco's complaint regarding its motion for directed verdict on liability, and render a take-nothing judgment in favor of Newco.

**(2) *Kennedy's Motion***

Kennedy asserts the trial court erred in denying its motion for directed verdict because there was no evidence that its integrated wire rope sling was defectively designed so as to be unreasonably

dangerous, taking into consideration the utility of the product and the risk involved in its use. *See Hernandez*, 2 S.W.3d at 257. Specifically, Kennedy maintains the evidence failed to raise a fact issue on the following five risk-utility factors[3] that are used to determine whether the defective design of a product rendered it unreasonably dangerous:

> (1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of the general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and (5) the expectations of the ordinary consumer.

*Hernandez*, 2 S.W.3d at 256 (citing *American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 432 (Tex. 1997)). We conduct the risk-utility analysis within the context of the product's intended use and its intended users. *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 312 (Tex. 2009).

Crenshaw responds that the evidence was sufficient to raise a fact issue as to whether Kennedy defectively designed an integrated wire rope sling that was unreasonably dangerous. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 82.001(4) (Vernon 2005) (defining a "manufacturer" as anyone who designs or assembles a product or any component part thereof and places the product or component part into the stream of commerce); *see also MCI Sales & Serv., Inc. v. Hinton*, 272 S.W.3d 17, 31 (Tex. App.—Waco 2008, pet. granted) ("[a] design defect renders a product unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use."). Specifically, Crenshaw contends the testimony of Ryles and McClay,

---

[3] Kennedy concedes that the evidence established the second of the five risk-utility factors–the existence of an alternative hook design which would not be unsafe or unreasonably expensive.

summarized above, as well as the testimony of Warren Hubler, H&P's Vice President for Health

Safety Environment, and Garland Kennedy, Vice President and co-owner of Kennedy Wire Rope

& Sling, raises a fact issue on each of the five risk-utility factors. We briefly summarize the

testimony of Hubler and Kennedy.

Warren Hubler testified that, due to H&P's prior experience with failed chain slings, he

contacted Kennedy about alternatives. He trusted Kennedy's expertise and advice with regard to

slings, wire rope, and equipment selection. Hubler stated that H&P looked to Kennedy for

"reputable instruction on what to watch out for and how to operate our rig safely with regard to

slings, rigging, and wire rope."

Garland Kennedy testified that his company publicly represents that it has experience in

heavy lifting, and offers consulting services on the use and safety of wire rope slings. He stated that

matching the sling to the particular job is "critical" in terms of safety, because if the wrong piece of

equipment is provided accidents can occur. Kennedy stated he is familiar with H&P's operations,

having done business with them for 27 years. Kennedy agreed that Hubler and H&P approached his

company about their problem with broken slings and dropped objects, and sought Kennedy's advice

on the "ultimate safest way" to do the job. In response, Kennedy analyzed H&P's lifting procedures

and conducted a variety of tests. Based on Kennedy's advice, H&P decided to purchase a braided

wire rope sling equipped with the Newco sliding choker hook.

We agree with Crenshaw that there was more than a scintilla of evidence sufficient to raise

a fact issue on each of the risk-utility factors. The evidence established that the particular design of

the braided wire rope sling with a Newco hook was chosen by Kennedy. Before recommending the

"improved" sling product to H&P, Kennedy made the decision to use braided wire rope, rather than

single wire rope, and then chose the Newco number 3 choker hook for assembly with the braided rope, knowing it did not have a safety latch. Ryles testified that not only does Newco sell a similar hook with a safety latch, although only for use with single wire rope, but a competitor, Crosby, also sells a hook with a safety latch that can be used with braided wire rope. In addition, Ryles testified that the sling should have incorporated a hook with a safety latch in order for the whole product to be as safe as possible for lifting overhead loads–in case slack got in the line. McClay testified that the hook without a safety latch was "inappropriate for that particular job;" specifically, McClay stated that, although the hook itself was not defective and did not fail, the sling design incorporating a hook without a safety latch allowed the load to come unhooked when slack got in the line, causing the accident. In addition, there is evidence that Kennedy had the ability to make the integrated sling product safer for lifting overhead loads without impairing its usefulness or significantly increasing costs. Further, the testimony of Hubler and Garland Kennedy shows that Kennedy was well aware of H&P's prior problems with chain slings that broke or failed and its need for a safer sling for use on it rigs, and yet recommended a sling that incorporated a hook without a safety latch. Hubler testified he would have liked to know about the option of using a hook with a safety latch, and that the additional cost would not have been an issue. Kennedy testified that incorporating a choker hook with a safety latch was feasible and would not have reduced the sling's utility.

Considering the evidence in the light most favorable to Crenshaw, we conclude that reasonable minds could differ on consideration of the five risk-utility factors, and thus the matter cannot be determined as a matter of law. *See Timpte*, 286 S.W.3d at 312 (issue of whether a product is defectively designed is generally a question of fact for the jury, although it may be determined as a matter of law in an appropriate case); *Hernandez*, 2 S.W.3d at 260-61 (determination of whether

product is unreasonably dangerous as designed may be a legal question if reasonable minds cannot differ on the risk-utility analysis). Because the issue of a design defect was a question of fact for the jury in this case, we hold the trial court did not err in denying Kennedy's motion for directed verdict on liability, and in submitting the issue to the jury.

## CONCLUSION

Based on the foregoing analysis, we conclude the challenged portion of the jury instruction on common law marriage was a direct comment on the weight of the evidence. The erroneous instruction was harmful to Crenshaw because it instructed the jury that a certain category of evidence on a contested, critical element of common law marriage was inadequate, and therefore suggested the trial judge's opinion and nudged the jury toward a defensive theory. However, because we conclude that Newco was entitled to a directed verdict on the issue of liability, we affirm the take-nothing judgment entered by the trial court in favor of Newco. By contrast, we do not conclude that Kennedy was entitled to a directed verdict on the issues of common law marriage or liability. Accordingly, we reverse the remaining portion of the trial court's judgment as to Kennedy and remand the cause of action as to Kennedy to the trial court for further proceedings.


Phylis J. Speedlin, Justice