**Opinion issued August 20, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-23-00752-CV

———————————

**RANDY CHARLES MCMULLEN, Appellant**

**V.**

**MINDY LOUISE HUFFMAN, Appellee**

---

**On Appeal from the 97th District Court
Archer County, Texas[1]
Trial Court Case No. 2021-0127A-CV**

---

[1]    Pursuant to its docket equalization authority, the Supreme Court of Texas transferred this appeal from the Second Court of Appeals to this Court. *See* TEX. GOV'T CODE § 73.001 (authorizing transfer of cases); TEX. R. APP. P. 41.3 ("In cases transferred by the Supreme Court from one court of appeals to another, the court of appeals to which the case is transferred must decide the case in accordance with the precedent of the transferor court . . . .").

## MEMORANDUM OPINION

This is an appeal from a Final Decree of Divorce and Order for Conservatorship and Child Support. Following a bench trial, the trial court held that the parties were common law married and divided the community estate accordingly. In two issues, Appellant Randy Charles McMullen argues the evidence was legally and factually insufficient to support the trial court's finding that he and Appellee Mindy Louise Huffman were common law married.

We affirm the trial court's judgment.

### Background

Appellant Randy Charles McMullen and Appellee Mindy Louise Huffman met on eHarmony, a dating website, in February 2014. They both lived in Wichita Falls, Texas. Mindy lived in an apartment and Randy lived in a house on Olivia Lane. In June 2014, Mindy and Randy agreed to live together and Mindy moved into Randy's house on Olivia Lane. Mindy obtained a Texas Driver's License with the Olivia Lane address in August 2014.

Sometime in 2014 or 2016, Mindy moved out of the Olivia Lane house because she and Randy had a disagreement involving a neighbor. Mindy first lived with her parents, and she later leased an apartment from February 2016 to August 2016. While the parties disagree on the date Mindy moved out of the Olivia Lane

2

house, it is undisputed that they continued to see each other and that they were still a couple in 2016.

The parties agree they discussed marriage in 2016, but they disagree on the exact date this first occurred. It is undisputed that Randy and Mindy decided to move to Florida in the summer of 2016 so that Randy could take a job there. In August 2016, while Randy was looking for a place for the couple to live in Florida, Mindy discovered back in Texas that she was pregnant. She called Randy in Florida to tell him about the pregnancy. Upon his return to Texas later in August, Randy and Mindy discussed the pregnancy, including paying for the birth, health insurance, and prenatal care. The topic of common law marriage came up at that time, but the parties disagree on whether they entered into an agreement at that time to be common law married. Shortly after, still in August 2016, the parties moved to Florida, and in September 2016, they sold the house on Olivia Lane. After the couple moved to Florida, Mindy was insured through Randy's employer as his spouse. And when Randy sold the Olivia Lane house in September 2016, he executed an affidavit for the Texas title company stating he had married Mindy on August 12, 2016.

The parties eventually moved from Florida to Ohio. Although they never had a formal wedding ceremony, Randy believed they were common law married until Mindy filed for divorce in Texas in 2021. Randy executed documents

3

naming Mindy as his spouse in Texas, Florida, and Ohio, and he filed joint federal tax returns with the Internal Revenue Service reflecting he and Mindy were married between 2016 and 2021.[2]

After Mindy filed a petition for divorce in Texas in 2021, Randy retained Texas counsel. Randy testified that based on his counsel's research, he concluded that he and Mindy were never in a common law marriage. After a two-day bench trial, the trial court held that Mindy and Randy were common law married in Texas on August 12, 2016, and the trial court divided the community estate accordingly. The trial court issued findings of fact and conclusions of law. This appeal ensued.[3]

### Trial

The court conducted a bench trial from June 21 to June 22, 2023. Six witnesses testified live and three testified by deposition during the portion of the trial devoted to the common law marriage issue.

---

[2] Florida does not recognize common law marriage. *See* FLA. STAT. § 741.211 (2024) (providing common law marriages entered into after January 1, 1968 are invalid). Ohio also does not recognize common law marriage. *See* OHIO REV. CODE ANN. § 3105.12 (West 2024) (providing common law marriages were prohibited beginning October 10, 1991).

[3] The trial also addressed custody of the couple's child, but the parties do not appeal that portion of the trial court's judgment.

## A.    The Witnesses

### 1.    Randy McMullen

Randy testified that he met Mindy in February 2014 on eHarmony.com. At that time, both lived in Wichita Falls. Randy lived in a house on Olivia Lane and Mindy lived in an apartment. Mindy moved into Randy's house in June 2014, and she received mail at the house. Randy testified that Mindy moved out in September 2014 because they "were having difficulties" in their relationship—mainly due to Julie Burnham, a neighbor who Mindy believed acted inappropriately with Randy.

According to Randy, Mindy lived with her parents from September 2014 until February 2016, when she rented an apartment. During that time, she spent some nights with Randy at the Olivia Lane house. Randy testified that he did not stay at Mindy's apartment, which was approximately five minutes from his house.

Randy testified that he and Mindy did not live together in June 2016. When Mindy would come over to stay at the house, she would bring an overnight bag with toiletries, makeup, clothes, pajamas, and dog food. Mindy's dog stayed at the Olivia Lane house only when Mindy was there.

In early August 2016, Mindy discovered she was pregnant. She called Randy, who was house hunting in Florida, to tell him. Around that time, Mindy had her wisdom teeth removed, and her parents took care of her until Randy

returned from Florida. Randy testified that he returned from Florida around August 8 or 10, 2016.

According to Randy, he and Mindy discussed common law marriage at that time, and it is "possible" he brought it up first. He testified, "The conversation came up, yes." Randy acknowledged that he brought up the topic of common law marriage, but he claimed the parties did not reach an agreement to be common law married at that time. Randy could not recall when the parties first discussed common law marriage, but he testified it was "possible" the issue first came up when he learned Mindy was pregnant in August 2016 and they were preparing to move to Florida. Once they learned about the pregnancy, Randy and Mindy discussed paying for the birth, health insurance, and prenatal care.

Randy first testified that Mindy may have spent a night or two at his house between August 11 and August 18, 2016, the date he moved to Florida. He later testified that Mindy spent the night at the Olivia Lane house from August 16 through August 19, 2016, when his brother-in-law came to help with the move to Florida.[4] Randy testified that during that time, Mindy had her dog with her, she probably had clothing at the house, and she put groceries in the refrigerator. Randy clarified his answer during an exchange with Mindy's counsel, stating that

---

[4] While there was some inconsistent evidence on the actual date of his move, the parties agree that Randy moved to Florida on August 18, 2016.

6

Mindy had spent the night at Olivia Lane every night from the time he returned to Texas on August 8 or 10, 2016, through the time he moved to Florida:

> Q: Do you dispute that—after you got back from Florida and looking for a place in Florida for y'all to move to, from the—that time until you took the moving trucks and moved to Florida, do you dispute that Mindy was spending nights at the Olivia Lane property during that time span?
>
> A: No. She stayed with me.
>
> Q: Okay. She stayed with you every night, didn't she?
>
> A: Yes, for a reason.
>
> Q: Okay. And even your brother-in-law confirmed she was staying with you?
>
> A: There's no—no contest to that, no.
>
> Q: Slept in the same bed with you?
>
> A: When I had a bed.
>
> Q: Had clothes there?
>
> A: She had a bag.

Randy testified that he bought an engagement ring for Mindy at Sam's on August 6, 2016. The ring had to be resized, so Mindy took it back to Sam's. Mindy picked up the ring and brought it with her to Florida.

While Randy does not dispute proposing to Mindy, his testimony concerning the timing of his proposal was inconsistent. He first testified that he proposed to Mindy on September 8, 2016, while the parties were in Florida, and that she said

7

yes.  According to Randy, he did not propose at any other time and the parties did not reach an agreement on common law marriage in Texas before moving to Florida.   Later, however, Randy testified that he offered to marry Mindy in Texas before leaving for Florida, but Mindy rejected his offer, telling him he "had to ask her dad for permission to marry her."  According to Randy, he asked Mindy's dad for permission to marry her on September 7, 2016, and he then asked Mindy to marry him on September 8, 2016, when they were in Florida, and she said yes.  At that time, Randy gave Mindy the ring.  The parties never had a ceremonial marriage in any state.

After moving to Florida, Randy sold his house on Olivia Lane.  The deed for the sale of the house is dated September 9, 2016.  That same day, Randy executed a marital status affidavit stating he was single when he bought the house, and he remained single continuously from that date until August 12, 2016, when he "married" Mindy.  Randy sent the marital status affidavit to the title company in Texas.  Randy conceded that in the affidavit, he represented that he was married to Mindy as of August 12, 2016.  According to Randy, he identified August 12, 2016 as the date of marriage in the affidavit because he "just kind of threw that number out there where it—I knew at that time I was in Texas and I figured that legally made me common law married to make everything just, so I wouldn't have any

problems moving forward." Randy testified that when he signed the affidavit he believed he had been common law married to Mindy as of August 12, 2016.

Randy testified why he previously considered himself common law married to Mindy. He testified that he purchased property in Florida in December 2016, and he stated on the warranty deed that he was married. Randy and Mindy also filed federal taxes as "married filing joint[ly]" in 2016. They later filed an amended 2016 federal tax return and again checked "married filing jointly." They likewise filed their 2017 and 2018 federal tax returns as "married filing jointly." Randy and Mindy also bought a lot in Florida on February 7, 2017, and the deed referred to Randy as a married man. Randy indicated that he and Mindy were married in a deed pertaining to the sale of their Florida house. And the deed for their purchase of property in Ohio also identified Randy and Mindy as married.

Randy testified that when he began his job in Florida in August 2016, he put Mindy on his health insurance and told his employer that Mindy was his spouse. To secure health insurance for Mindy through his employer, Randy signed an "affidavit of common law marriage" indicating he was married to Mindy on August 1, 2016. The affidavit stated that he and Mindy had satisfied the requirements of common law marriage in the State of Texas. Randy attached a copy of the couple's joint federal tax return as documentary evidence of their

marriage. According to Randy, he considered Mindy to be his spouse when she was covered on his health insurance policy in Florida.

The couple eventually moved to Ohio, where they later separated and commenced a custody proceeding. On June 2, 2021, Randy signed an affidavit in the Ohio custody proceeding indicating he and Mindy were common law married in Texas. In this affidavit, Randy stated that he and Mindy had lived together for the previous five years.[5]

Mindy filed her original petition for divorce in Texas on September 23, 2021. One month later, on October 12, 2021, Randy signed an affidavit in the Texas divorce proceeding retracting his prior representation that he and Mindy were common law married.[6] Randy testified that he did not seek a divorce in Ohio because he hoped he and Mindy would reconcile. He still believed as late as October 2021 that he and Mindy were common law married. Randy did not change his mind about the common-law marriage until Mindy filed for divorce in Texas and he hired a Texas attorney to research common law marriage and to represent him in the divorce proceedings filed by Mindy. At that time, he concluded for the first time that he was not common law married. Randy testified,

_____

[5] When asked in the Texas trial about this affidavit, Randy testified that the affidavit contained a "generalized statement referring to a period of time. There is no specific date listed."

[6] Despite this retraction, Randy testified that his employer in Ohio was still providing health insurance to Mindy as his spouse.

10

"I believed that I was married until I found out, became aware, of the laws, [Texas Family Code Section] 2.401 . . . after [my Texas counsel] had done some research for me and found [] supporting case law."  Randy testified that his mind was changed because, "You had to cohabitate together in the State of Texas after you declare yourself common law married while in the State of Texas."[7]

Randy conceded that he previously testified in the Ohio proceedings that he believed he and Mindy were common law married in Texas.  He testified:

| | |
|---|---|
| Mindy's counsel: | So the divorce case could have been in Ohio according to your testimony in October of 2021, correct? |
| Randy: | Correct. |
| Mindy's counsel: | And that would be based upon being common law married in the State of Texas, correct? |
| Randy: | Correct. |
| Mindy's counsel: | On—October of 2021, being consistent with all of the deeds that refer to you as married and all of the affidavits where you stated that you're married and you're common law married, you believed in October of 2021 that you were common law married; isn't that correct? |
| Randy: | Correct. |

---

[7] After retaining his Texas counsel, Randy testified in the Ohio custody proceeding that of the three elements required in Texas for a common law marriage, the one he disputed was that of cohabitation in Texas after reaching an agreement to be married.  Although the Ohio custody proceeding was filed first, the testimony at issue was elicited in the Ohio proceeding after the Texas proceeding began.

| Mindy's counsel: | And the first time that you ever challenged whether you were common law married was after [Mindy] filed for divorce in the State of Texas, correct? |
|---|---|
| Randy: | Correct.[8] |

## 2. Mindy Huffman

Mindy testified that she and Randy began living together at the Olivia Lane house in June or July 2014. At the time, she had an apartment lease that was set to expire in August 2014.

On August 25, 2014, Mindy obtained a Texas Driver's License reflecting she lived on Olivia Lane. And in September 2014, she applied for a job, indicating on her resume that she lived on Olivia Lane. Mindy also received mail at Olivia Lane, and her car insurance policy, issued on September 23, 2015, indicated she lived on Olivia Lane.

According to Mindy, in February 2016, she rented an apartment because she and Randy had a disagreement about a next-door neighbor, Julie Burnham. Julie would "constantly" go to the house when Mindy was not there, and she would tell lies about Mindy. There were also times when Julie "thr[e]w herself" at Randy. After Julie moved away in May or June 2016, Mindy testified that she "was over

---

[8] Randy's testimony was contradictory. Notwithstanding his testimony in Ohio that he believed as late as October 2021 that he was common law married to Mindy, he testified in Texas that he believed as early as August 2021 that he and Mindy had not been common law married.

12

there [at Olivia Lane] every night and everything was much better. [Julie] wasn't around. I didn't have to worry about whether she was gonna be interfering in our relationship."

According to Mindy, she and Randy spent most of their nights together from February 2016 through June 2016 at the Olivia Lane house. She testified that after Julie moved away, Mindy stayed at the Olivia Lane house "almost every night." Her clothes, makeup, toothpaste, toothbrush, dog, the dog's kennel, and dog food were at the Olivia Lane house.[9] At the end of July 2016, Randy and Mindy decided to move to Florida, and Randy traveled to Florida the following month to look for a place to live.

On August 8, 2016, Mindy found out she was pregnant. She called Randy that same day to tell him the news. Randy was in Florida looking for a place for the couple to live. He was "excited" and "happy" to hear about the baby. While Randy was still in Florida, Mindy had her wisdom teeth removed and she stayed with her parents. When Randy returned from Florida on August 11, 2016, he picked Mindy up from her parents' house and they went "home" to the Olivia Lane house.

---

[9] The court admitted photos of Mindy's apartment. The photos showed a fully furnished bedroom, a kitchen, and what appears to be a living room with a couch, chairs, television, and a DVD player. The photos also show an unfurnished living room. It is unclear when the photos were taken.

13

According to Mindy, when Randy was in Florida in August 2016, she and Randy had a conversation and Randy brought up common law marriage. She testified that Randy "had already talked to the people from his work [in Florida] about putting me on insurance and [] he suggested that we be common law." Mindy agreed. She believed the conversation occurred on August 11, 2016 "because we talked about it again in Texas when [Randy] was here just to make sure that this is what he really wanted to do."

Mindy testified that she and Randy lived together from August 11 through August 18, 2016—the date Randy moved to Florida. Mindy told her mother on August 12, 2016 that she and Randy were common law married and that they decided to be common law married because she was pregnant and they were going to get married anyway. Mindy also told her friend Sadie Snow that she and Randy were common law married. She testified that Randy also told his brother-in-law, Jason St. Bernard, that they were common law married. Jason was in Texas to help Randy with the move to Florida.

Mindy testified that Randy first proposed to her in March 2016 in Texas. "We had gotten in a fight and he pulled out the ring." Mindy did not believe Randy had severed ties with the neighbor, Julie, so she said no. Randy proposed again in September 2016, because she "asked him to get on one knee since he did not do it in Texas. I wanted that tradition." Mindy asked Randy to propose to her

14

in Florida by getting on his knee "because he didn't do it in Texas, and we were already married, we already had stated that we were common law. I just still wanted that experience because most girls want the big wedding, and I didn't get that. I got a common law marriage." Randy put the ring on her finger on September 8 or 9, 2016, when she first arrived in Florida, because the ring was being resized when Randy was in Texas.[10]

Mindy testified that since leaving Texas, Randy has had three jobs and she has been covered under his employer's health insurance at each job. She and Randy never had a formal marriage ceremony. Mindy knew they were filing federal tax returns from 2016 through 2019 as a married couple. She testified that during the Ohio proceeding, Randy made representations to the court that they were common law married and had lived together for the previous five years.

During cross-examination, Randy's counsel elicited testimony from Mindy to negate her argument that she and Randy had been common law married. Mindy testified that in 2016, her bank records reflected a P.O. box address in Archer City, Texas.[11] She also testified that she paid utility bills for the apartment she leased from February 2016 through August 2016. Mindy acknowledged that she filed a

---

[10]    The ring had to be resized several times in Texas. After it was resized, Mindy picked up the ring from the store in Texas and took it to Florida with her. Randy was already in Florida.

[11]    The P.O. box belonged to Mindy's parents.

request for a civil protective order in Ohio and she did not indicate that she and Randy were married. She also did not change her Facebook status to married. Mindy also testified that she and Randy do not celebrate an anniversary or exchange gifts in August. And she told a guardian ad litem in the Ohio proceeding both that she was single and common law married, a discrepancy she blamed on her being "confused" during the proceeding.

### 3. Sadie Snow

Sadie Snow testified that she and Mindy have been friends since elementary school. In August or September 2016, before Mindy moved to Florida, Mindy called her. Mindy told Sadie "that she was pregnant and that [she] and Randy were considered common law married and that they were going to have a bigger wedding at a later date." Sadie testified that "the majority" of Mindy's "stuff" was at the Olivia Lane house when she visited her. Mindy's dog was also at the Olivia Lane house when Sadie visited her there.

### 4. Loyce Huffman

Loyce Huffman is Mindy's mother. Loyce testified that Mindy moved into the Olivia Lane house about four months after meeting Randy in 2014. She visited Mindy at the Olivia Lane house about once a week. She testified that Mindy had some furniture and clothes at the Olivia Lane house and Mindy's dog also lived there.

Loyce testified that Mindy moved from Olivia Lane to her parents' house in January 2016, because of Randy's relationship with Julie, the next-door neighbor. Mindy stayed with her parents for about a month and a half and then she rented an apartment in February 2016. When Mindy moved out of the Olivia Lane house, Randy "never stopped calling her." Loyce knew Randy had spent some nights at the apartment because Mindy said he did not like to stay there because she had a double bed. Loyce testified she drove by the apartment and saw Randy's car outside the apartment once.

According to Loyce, when Randy first proposed to Mindy, she declined because she did not think the issue with Julie had been resolved. After Julie moved away, Mindy went back to stay in the house on Olivia Lane. Loyce visited Mindy at the Olivia Lane house weekly.

Mindy told Loyce she was pregnant on August 9, 2016. Around that time, Mindy's wisdom teeth had been taken out and Randy had gone to Florida to find a place for them to live. Randy picked up Mindy from her parents' house on August 11, 2016, when he returned from Florida. On August 12, 2016, Mindy told Loyce that she and Randy were going to be common law married because Randy's insurance in Florida would cover her pregnancy if they were married. After that, Mindy spent her nights at the Olivia Lane house.

17

Loyce testified that she saw her daughter's belongings at the Olivia Lane house the week before Randy moved to Florida. She saw Mindy's dog, laundry baskets, laundry, bathroom hat, hair products, makeup, clothes, and shoes at the house. Randy left for Florida on August 18, 2016, and Mindy drove to Florida with Loyce on September 8, 2016. Based on her conversation with Mindy, Loyce considered the couple to be common law married. She considered Randy to be her son-in-law. She testified that Randy bought Mindy a ring in Texas, but it had to be resized and Mindy picked it up in Texas right before she left for Florida.

### 5. Julie Burnham

Julie Burnham testified that she was Randy's next-door neighbor on Olivia Lane. According to Julie, she, Randy, and Mindy were friends, although she described Mindy as "standoffish." She testified that she did not act inappropriately with Randy. She knew Randy and Mindy had "a couple of different disagreements" about her.

She saw Mindy move out of the house with "just a suitcase" after a fight with Randy. She testified that Mindy told her that "it wasn't gonna work out and she was leaving." She did not see Mindy move large items out of the house at that time.

Julie and her husband moved out of their Olivia Lane property in June 2016. Julie testified she did not know where Mindy lived after that. Julie testified that

before she moved from Olivia Lane, she did not see Mindy's car parked in Randy's driveway often, and she did not see a dog there. She testified that Mindy lived in the Olivia Lane house in September 2014 and during parts of 2015. Julie knew Mindy spent the night there "a few nights a week," "depending on the week."

Julie testified she never had discussions with Randy about him being common law married to Mindy. She only talked to him once after she left town— it was when Randy was in Florida, and he did not say he was common law married.

**6.** **Summer Wall**

Summer Wall testified she lived close to Randy from approximately 2013 to 2017. She is friends with Julie, and she never saw Julie act inappropriately toward Randy. Summer testified that she was inside Randy's house six or seven times and she did not see a dog there. She knew Mindy spent the night at Randy's house but did not recall how often. She assumed Mindy kept clothing at the Olivia Lane house.

Summer testified that Mindy told her in 2016 that she kept her apartment "just in case." Summer did not recall the couple living together, and she said that Randy's house was "fully furnished and decorated already," so she never saw a moving van with Mindy's belongings. Rather, she remembered Mindy staying at the Olivia Lane house "off and on."

19

Summer could not recall how often she was in Randy's house or whether any of those times were before Randy and Mindy met. She testified that she did not remember any discussion of the couple's marriage when she was with Randy or Mindy.

### 7. Michael Hays

Michael Hays, a next-door neighbor of Mindy and Randy in Ohio, testified in his deposition that he and his wife assumed the parties were married because they were a family living in the house next door. Randy and Mindy did not mention that they were married when they were introduced to him, and he did not notice whether Mindy was wearing a ring. Randy and Mindy did not refer to each other as husband and wife, and he was not aware of them celebrating any anniversaries.

### 8. Angela St. Bernard

Angela St. Bernard is Randy's sister. She testified via deposition that when she visited the couple in Florida after their daughter was born, they did not indicate they were married. She did not learn until 2021 that Mindy and Randy believed they were common law married. She never heard Randy introduce Mindy as his wife. She first saw the engagement ring in Florida. In light of the ring, she assumed they were engaged but she did not ask Mindy about it.

### 9. Jason St. Bernard

Jason St. Bernard is married to Randy's sister, Angela. He testified via deposition that he went to Texas in August 2016 to help Randy move to Florida, and he was there about three nights. He did not recall any conversation regarding Randy and Mindy being engaged or married. But he knew Mindy was moving to Florida with Randy. He believed Mindy spent the night at the house on at least two of the nights he was in Texas. Mindy's dog was in the house the entire time when he came to help with the move.

In August 2021, Jason signed an affidavit stating that Mindy and Randy were not living together in 2016. He came to that conclusion because Mindy had her own apartment when Jason was in Texas in August 2016. Jason did not know, however, how often Mindy spent the night at the Olivia Lane house or whether her clothes and personal effects were in the house in August 2016.

Jason testified that he did not recall Randy telling him he and Mindy were common law married. Jason did not think they were married, and he never heard discussions about the couple being married at any time.

## B. Closing Arguments

Randy argued that the parties had entered into a contract to be common law married after Mindy accepted his proposal in Florida. He argued they were not

common law married in Texas because they never lived together in Texas. He further argued:

> The offer was made in Texas, but it was rejected and if an offer is made and it's rejected, it cannot be accepted again until it's offered again. It was offered again in Florida, at which time she accepted it, put the ring on her finger. And the two of them went through life believing they were common law married, even though they didn't fully represent to everybody that they met. They represented to the IRS. They represented to employers. The main purpose that Randy had proposed to her in the first place was to provide for her child, provide insurance for his child, and a woman he considered to be his wife.

According to Randy, he only learned in August 2021 that he was not common law married, and "everything" he signed before that was executed with the "good faith belief[] that he was common law married." However, "[h]e learned that there are additional facts that he had to establish before he was common law married. That's what caused him to change his opinion."

Mindy argued that there was "no question" she and Randy had "agreed to be married when they were in Texas. That is uncontradicted." She argued that when Randy returned from Florida in August 2016, they made that decision. According to Mindy, Randy confirmed as much when he "signed [] numerous affidavits [stating] they [had] reached that agreement on August the 12th of 2016." Pointing to Randy's affidavit of common law marriage executed on February 8, 2018, Mindy argued that the document confirmed their marriage agreement because it stated "that she [was Randy's] spouse and we have satisfied the requirements of

22

the State of Texas." Mindy's counsel argued: "[T]his man went from August of 2016 along with my client and in '16 and '17 and '18 and '19, up until October of 2021, when he testified in Ohio he believed that they were common law married, and she did too." He argued that Randy and Mindy held themselves out in Texas as common law married. Mindy argued that she told Sadie and her mother about the marriage, and Randy told his brother-in-law.

## C. The Judgment

Following the close of testimony and the parties' closing arguments, the trial court rendered the following judgment:

> The Court, based on the evidence submitted during this hearing finds by [a] preponderance of the evidence that the parties entered into an agreement that they were common law married on August 12th, 2016, in the State of Texas; that thereafter they cohabitated in the State of Texas under that agreement; and further that they held themselves out to others in the State of Texas and elsewhere as being common law married after the date of that agreement. Based on these findings, the Court finds the parties are common law married at the time of this hearing and at all times from August 12th, 2016, forward.

The trial court signed a Final Divorce Decree on August 31, 2023.

### Findings of Fact and Conclusions of Law

On September 26, 2023, the trial court issued findings of fact and conclusions of law. The trial court found that Mindy and Randy "were parties to an informal marriage that commenced on August 12, 2016" and that they had "separated on or about March 19, 2021." The court identified sixty-four

23

documents and testimony excerpts it relied on to determine the existence of a common law marriage, including the September 9, 2016 marital status affidavit in which Randy stated he was single until August 12, 2016, when he married Mindy; federal tax returns that Randy and Mindy filed as "married, filing joint" for the years 2016 through 2019; a February 8, 2018 affidavit of common law marriage, where both Randy and Mindy swore they established a common law marriage that satisfied the requirements of the State of Texas; a February 26, 2019 general warranty deed that identified Randy and Mindy as married; and a June 2, 2021 affidavit executed by Randy that stated the parties were "common law married through the State of Texas" and that the parties had "lived together for five years and separated on March 16, 2021." The trial court also relied on the testimony of the parties and of Angela St. Bernard, Michael Hays, and Jason St. Bernard.

Randy appeals from the trial court's Final Decree of Divorce arguing in two issues that the evidence is legally and factually insufficient to support the trial court's finding that the parties were in an informal marriage.

## Standard of Review and Applicable Law

In family law cases, legal and factual sufficiency challenges do not constitute independent grounds for asserting error but are relevant factors in determining whether the trial court abused its discretion. *Garcia v. Garcia*, No. 02-11-00276-CV, 2012 WL 3115763, at *2 (Tex. App.—Fort Worth Aug. 2, 2012,

24

no pet.) (mem. op.) (quoting *Neyland v. Raymond,* 324 S.W.3d 646, 649 (Tex. App.—Fort Worth 2010, no pet.)).[12]  To determine whether the trial court abused its discretion because the evidence is legally or factually insufficient to support the trial court's judgment, we consider first whether the trial court had sufficient evidence upon which to exercise its discretion, and next whether it erred in its application of that discretion.  *Id.* (citing *Boyd v. Boyd,* 131 S.W.3d 605, 611 (Tex. App.—Fort Worth 2004, no pet.); *Mincer v. Summers*, No. 02-21-00150-CV, 2022 WL 1573715, at *9 (Tex. App.—Fort Worth May 19, 2022, pet. denied) (mem. op.).  We conduct the applicable sufficiency review when considering the first prong of the test.  *Garcia*, 2012 WL 3115763, at *2 (citing *Boyd*, 131 S.W.3d at 611).  We then "determine whether, based on the elicited evidence, the trial court made a reasonable decision."  *Id.*  A court abuses its discretion if it acts "without reference to any guiding rules and principles."  *Morrow v. H.E.B., Inc.*, 714 S.W.2d 297, 298 (Tex. 1986) (citing *Downer v. Aquamarine Operations, Inc.*, 701 S.W.2d 238 (Tex. 1985)).  A court, however, does not abuse its discretion if there is some evidence of a substantive and probative character to support its decision.  *Reddick v. Reddick*, 450 S.W.3d 182, 187 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

---

[12]     Because factual and legal sufficiency are not "independent reversible grounds of error," we consider Randy's issues together.

25

A party who seeks to establish an informal marriage in Texas must prove that "(1) the couple agreed to be married; (2) after the agreement, they lived together in Texas as spouses; and (3) they represented to others that they were married." *Luna v. Garcia*, No. 02-23-00209-CV, 2023 WL 7400927, at *4 (Tex. App.—Fort Worth Nov. 9, 2023, pet. denied) (mem. op.) (citing TEX. FAM. CODE § 2.401(a)(2)).[13]  A common-law marriage "does not exist until the concurrence of all three elements." *Nguyen v. Nguyen*, 355 S.W.3d 82, 88 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (citing *Eris v. Phares*, 39 S.W.3d 708, 713 (Tex. App.—Houston [1st Dist.] 2001, pet. denied)).  The existence of an informal marriage is a fact question. *Id.*  The party who seeks to establish the informal marriage must prove all three elements by a preponderance of the evidence. *Id.*; *Luna*, 2023 WL 7400927, at *4 ("Until the three elements co-exist, there is no . . . marriage.") (quoting *Winfield v. Renfro*, 821 S.W.2d 640, 648 (Tex. App.—Houston [1st Dist.] 1991, writ denied)).

---

[13]  Section 2.401 of the Texas Family Code provides that a common law or informal marriage "may be proved by evidence" that

> the man and woman agreed to be married and after the agreement they lived together in this state as husband and wife and there represented to others that they were married.

TEX. FAM. CODE § 2.401(a)(2).

**Existence of Common Law Marriage**

Randy argues, and we agree, that if there was a common law marriage, it began between August 12, 2016, the date Randy attested in various forms and venues that he and Mindy became common law married, and August 18, 2016, when Randy left Texas to move to Florida. Randy argues that Mindy "failed to produce a scintilla of evidence" to establish the required elements of a common law marriage. Mindy responds she established each element by a preponderance of the evidence.

## A. First Element: Agreement to be Married

The first element required to establish a common law marriage is an agreement to be married. *Luna*, 2023 WL 7400927, at *4 (citing TEX. FAM. CODE § 2.401(a)(2)). "To establish an agreement to be married, the evidence must establish that the parties intended to have a present, immediate, and permanent marital relationship" and that they in fact agreed to be husband and wife. *In re Est. of Walker*, No. 2-08-371-CV, 2009 WL 1996301, at *2 (Tex. App.—Fort Worth July 9, 2009, no pet.) (mem. op.) (citing *Eris*, 39 S.W.3d at 714). An agreement to be married may be established through direct or circumstantial evidence. *Id.* (citing *Russell v. Russell,* 865 S.W.2d 929, 933 (Tex. 1993)). "It is well-established that the agreement to marry need not be shown by direct evidence, but may be implied or inferred from evidence that establishes the elements of

cohabitation and holding out to the public as husband and wife." *Cutler v. Cutler*, No. 04-15-00693-CV, 2016 WL 4444418, at \*3 (Tex. App.—San Antonio Aug. 24, 2016, no pet.) (mem. op.) (citing *Collora v. Navarro*, 574 S.W.2d 65, 69 (Tex. 1978)). Testimony by one of the parties constitutes direct evidence of an agreement, whereas "the conduct of the parties and evidence of cohabitation and representations to others" constitutes circumstantial evidence. *In re Est. of Walker*, 2009 WL 1996301, at \*2; *see Russell*, 865 S.W.2d at 933 n.1 (noting there is no bright-line test "concerning the evidence which does and does not constitute circumstantial evidence of an agreement to be married").

Randy argues the evidence is "scant, arguably nonexistent" as to the parties' agreement to be married. He argues that he and Mindy did not have a "present, immediate, and permanent agreement to be married" in Texas, as reflected by Mindy's refusal to marry him when he first asked her to marry him in Texas and her later agreement to marry him in Florida. Mindy responds that notwithstanding her earlier rejection of Randy's proposal in Texas, Randy broached the subject of common law marriage in Texas again on August 11, 2016 or the following day, and they both agreed to that course of action on August 12, 2016, while both parties were still in Texas. She testified that in fact, Randy had already "talked to the people from his work [in Florida] about putting" Mindy on his health insurance and "he suggested that [they] be common law" in August 2016, and Mindy agreed.

28

Mindy testified that she believed the conversation occurred on August 11, 2016, because "they talked about it again in Texas" when Randy returned from Florida "to make sure that this is what he really wanted to do."

During his testimony, Randy conceded that he first brought up the topic of common law marriage in August 2016, before he moved to Florida. He testified that when he learned of Mindy's pregnancy, he and Mindy discussed how they would pay for the birth, health insurance, and prenatal care, and he brought up the issue of common law marriage. Randy also unequivocally testified that he believed on September 9, 2016, when he signed the marital status affidavit for sale of the Olivia Lane house, that he had been common law married to Mindy as of August 12, 2016.

The evidence also reflects the parties filed federal tax returns with "married, filing joint" status from 2016 through 2019. In his briefing, Randy does not address the filing of the federal tax returns directly. He merely lumps them in with other documents executed after his move to Florida, all of which he claims are irrelevant to the inquiry at hand. But the tax returns and other documents executed by Randy clearly manifest his belief that he was married to Mindy in Texas, and some indicate that the marriage occurred on August 12, 2016 in Texas, as the trial

court concluded.[14] The filing of joint income tax returns "can [] be probative of an agreement to be married." *Finch v. Stegman*, No. 01-19-00109-CV, 2020 WL 4516866, at *5 (Tex. App.—Houston [1st Dist.] Aug. 6, 2020, no pet.) (mem. op.) (citing *Flores v. Flores*, 847 S.W.2d 648, 652 (Tex. App.—Waco 1993, writ denied) ("[A] forthright assertion of marriage with the consequences of liability— such as . . . the filing of a[] joint income tax return—may be far more probative of such an agreement.")).

To the extent the trial court relied on sworn documents executed by Randy outside of Texas, such as the September 9, 2016 marital status affidavit reflecting a marriage date of August 12, 2016, the February 8, 2018 affidavit of common law marriage reflecting a marriage date of August 1, 2016, and the June 2, 2021 affidavit executed by Randy in the Ohio proceeding stating that the parties were common law married "through the State of Texas," we hold these documents are circumstantial evidence of the couple's agreement to be married in Texas. *See Russell*, 865 S.W.2d at 933 (holding agreement to be married may be proved by circumstantial evidence).

Randy also testified that he believed he was common law married in Texas until he hired a Texas divorce attorney in 2021. Even if Randy did not understand the legal requirements for being common law married in Texas, he clearly believed

---

[14] In fact, Randy used the federal tax returns as evidence of his common law marriage to secure health insurance for Mindy through his employer in Florida.

for several years that he and Mindy were common law married—and therefore that he and Mindy had reached an agreement to marry. Mindy's counsel asked Randy during trial if he believed he could have filed for divorce earlier in the Ohio proceeding "based upon being common law married in the State of Texas," and Randy responded, "Correct."

In light of the admitted evidence and the testimony elicited at trial, we conclude the trial court did not abuse its discretion by holding the parties agreed to enter into a "present, immediate, and permanent marital relationship" on August 12, 2016. Although the parties' testimony regarding an agreement to be married was inconsistent, the trial court as the factfinder was the sole judge of the witnesses' credibility and the weight to be given their testimony, and the trial court was at liberty to believe Mindy over Randy. *See Finch*, 2020 WL 4516866, at \*5 ("Although the parties' testimony regarding an agreement to be married is inconsistent, the factfinder was the sole judge of the witnesses' credibility and the weight to be given their testimony, and the factfinder could choose to believe [Appellee] over [Appellant]."); *Meshell v. Lippi*, No. 02-15-00212-CV, 2016 WL 2840877, at \*4 (Tex. App.—Fort Worth May 12, 2016, no pet.) (mem. op.) (observing in "he-said, she-said case," trial court judge "was the sole judge of the credibility of the witnesses and the weight to be given to their testimony" in determining whether common law marriage existed).

## B. Second Element: Living Together After the Agreement

The second element of a common-law marriage requires proof that the parties lived together as husband and wife in Texas. *Luna*, 2023 WL 7400927, at *4. Cohabitation, like the other elements of common law marriage, is determined "on a case-by-case basis." *Omodele v. Adams*, No. 14-01-00999-CV, 2003 WL 133602, at *3 (Tex. App.—Houston [14th Dist.] Jan. 16, 2003, no pet.) (mem. op.).[15]

Mindy argues that after the parties discussed common law marriage and agreed to an informal marriage, she lived with Randy at the Olivia Lane house at least from August 11 through August 18, 2016, when Randy left for Florida. Randy acknowledged during trial that Mindy "stayed with [him] every night" on Olivia Lane from August 11 through August 18, 2016, when he moved to Florida.[16] Randy argues, however, that he and Mindy did not "live together"

---

[15] *See Garcia v. Garcia*, No. 02-11-00276-CV, 2012 WL 3115763, at *5 (Tex. App.—Fort Worth Aug. 2, 2012, no pet.) (mem. op.) ("[T]he circumstances of each case must be determined based upon its own facts[.]") (citing *Est. of Claveria v. Claveria,* 615 S.W.2d 164, 166 (Tex. 1981)).

[16] Neither "the Family Code nor the common law provide a bright-line test to determine the length of time a couple must cohabitate to satisfy" the second element of common law marriage. *Omodele v. Adams*, No. 14-01-00999-CV, 2003 WL 133602, at *3 (Tex. App.—Houston [14th Dist.] Jan. 16, 2003, no pet.) (mem. op.) (citing TEX. FAM. CODE § 2.401(a)(2)); *see also Hundl v. Nigh*, No. 14-94-01145-CV, 1996 WL 65381, at *4 (Tex. App.—Houston [14th Dist.] Feb. 15, 1996, no writ) (not designated for publication) (same; considering predecessor statute); *Durr v. Newman*, 537 S.W.2d 323, 326 (Tex. App.—El Paso 1976, writ

32

during that time.  He claims that Mindy only "had a bag" with her at the house and came over to spend the night, conduct amounting to a mere "sleepover."  He argues that Mindy had her own apartment during that time, further casting doubt on her cohabitation argument.

We are not persuaded by Randy's argument that Mindy's stay at the Olivia Lane house from August 12 through August 18 was a mere "sleepover" based on her having only a bag with her on those nights.  Mindy's mother testified that she visited Mindy at the Olivia Lane house and that the week before Randy moved to Florida, she saw several of Mindy's personal effects at the house, including Mindy's dog and her laundry baskets, laundry, bathroom hat, hair products, makeup, clothes, and shoes.  There was also testimony that Randy's house was "fully furnished" and decorated by the time the couple allegedly decided to marry, and they were packing to move to Florida that same week.

Randy makes much of the "separate residence" Mindy maintained from August 11 through August 18, 2016, referring to her apartment, but we are not swayed by that argument, either.  According to Mindy, she leased the apartment beginning in February 2016 and the lease expired in August 2016.  The fact that Mindy had an apartment—leased several months prior to the parties' agreement to become common law married—and that she continued to pay rent and utilities

---

ref'd n.r.e.) ("The short three-day period of time that the parties were [living] together is not controlling[.]") (citation omitted).

pursuant to her lease through August 2016 does not indicate that the parties were not living together on Olivia Lane after their agreement to marry on August 12, 2016.[17]

Randy relies on *Ex parte Threet*, 333 S.W.2d 361 (Tex. 1960), to argue he and Mindy did not live together in Texas. But that case is materially different. In *Ex parte Threet*, "the plaintiff apparently wanted to keep the alleged marriage a secret except from four or five of her closest friends. The [couple] never moved into or occupied, publicly, a common residence or room." *Id.* at 364. Further,

> [t]he plaintiff candidly admitted that she and the defendant never established a home together. She never moved in with defendant at his house, nor he into hers. She continued to give her parents' residence as her residence. [She did not move] any of his or her clothes or personal effects into any common room or apartment.

*Id.* at 363. And the couple never spent an entire night together. *Id.*

Here, Mindy testified that she moved into the Olivia Lane house and Randy acknowledged that she stayed there at least from August 11 through August 18, 2016. Mindy testified that the parties first discussed common law marriage in August 2016 while Randy was in Florida. Upon his return to Texas, he picked up Mindy from her parents' house and they drove together to the Olivia Lane house where Mindy remained until Randy left for Florida on August 18, 2016. Both

---

[17] Randy also argues that Mindy used her parents' P.O. box rather than the Olivia Lane address to receive mail, further indicating they did not live together. But Mindy testified that she received some mail at the Olivia Lane address.

parties conceded that Mindy had clothes at the Olivia Lane house, and Mindy testified that her dog and several of her personal effects were at the house as well. Indeed, according to Randy's brother-in-law, Jason, Mindy and her dog spent the night at the house the entire time he was there in August 2016. Randy also testified that Mindy filled the refrigerator with groceries during that time.

We hold that based on the testimony and admitted evidence, the trial court reasonably could have concluded that the parties lived together in Texas after they agreed to be common law married on August 12, 2016. *See Garcia*, 2012 WL 3115763, at *2. To the extent there was controverting evidence, the trial court, as the factfinder, was at liberty to resolve any conflicts in the evidence. *See Romano v. Newell Recycling of San Antonio, LP*, No. 04-07-00084-CV, 2008 WL 227974, at *6 (Tex. App.—San Antonio Jan. 30, 2008, no pet.) (mem. op.) (observing conflicts between testimony and documentary evidence "do not preclude a finding that a [common law] marriage existed . . . rather the conflicts go to the weight of the evidence and were for the [fact finder] to resolve"). Thus, the trial court did not abuse its discretion by holding Mindy established the second element of a common law marriage.

## C.    Third Element:  Representing or "Holding Out" to Others

To establish the third element of a common law marriage, Mindy had to establish that the parties represented to others that they were married. *Luna*, 2023

WL 7400927, at *4. Although Randy conceded during his closing arguments that he and Mindy held themselves out as married to the IRS and to his various employers, Randy now argues that neither he nor Mindy represented or "held out" to others that they were common law married.

"The statutory requirement of 'represent[ing] to others' is synonymous with the judicial requirement of 'holding out to the public.'" *Eris*, 39 S.W.3d at 714–15 (quoting *Winfield*, 821 S.W.2d at 648). It is well settled in Texas that "there can be no secret common law marriage." *Van Hooff v. Anderson*, No. 07-14-00080-CV, 2016 WL 193172, at *5 (Tex. App.—Amarillo Jan. 14, 2016, no pet.) (mem. op.) (citing *Ex parte Threet*, 333 S.W.2d at 364–65). However, "there is no bright-line quantitative test for what constitutes sufficient evidence of holding out to others." *Crenshaw v. Kennedy Wire Rope & Sling Co.*, 327 S.W.3d 216, 224 (Tex. App.—San Antonio 2010, pet. granted, judgm't vacated w.r.m.).

"Spoken words are not necessary to establish representation as husband and wife." *Quinn v. Milanizadeh*, No. 01-07-00489-CV, 2008 WL 1828327, at *6 (Tex. App.—Houston [1st Dist.] Apr. 24, 2008, no pet.) (mem. op.) (citing *Winfield*, 821 S.W.2d at 648). "Written references to the marriage or to a party as 'spouse' are evidence of 'holding out.'" *In re Est. of Sanchez*, No. 04-11-00332-CV, 2012 WL 1364979, at *4 (Tex. App.—San Antonio Apr. 18, 2012, pet. denied) (mem. op.) (citing *Est. of Claveria v. Claveria*, 615 S.W.2d 164, 167 (Tex.

36

1981)); *see also Westerman v. Richardson*, No. 13-02-420-CV, 2004 WL 100400, at *2 n.1 (Tex. App.—Corpus Christi–Edinburg Jan. 22, 2004, no pet.) (mem. op.) (holding representation may be through speech or conduct or combination of both). "[I]nherent in the concept is behavior intended as a communication to third parties, not just intimate behavior in general." *Mills v. Mest*, 94 S.W.3d 72, 75 (Tex. App.—Houston [14th Dist.] 2002, pet. denied).

Significant to the facts here, "[a] party's signing of a warranty deed for disputed property as a single or unmarried person in connection with its transfer is 'particularly significant' to the element of holding out." *Finch*, 2020 WL 4516866, at *5 (citing *Eris*, 39 S.W.3d at 708); *see also Est. of Claveria*, 615 S.W.2d at 167 (holding recorded deed from purchase of house acknowledged by husband and wife was direct evidence of common law marriage). And evidence that a couple filed joint tax returns is "strong corroboration" that the couple was married. *See Garcia*, 2012 WL 3115763, at *4–5 (noting parties "represented to third parties that they were married by filing joint tax returns" and that tax returns, "with their consequences of liability, provide strong corroboration" that couple was married);[18] *Leyendecker v. Uribe*, No. 04-17-00163-CV, 2018 WL 442724, at *3

---

[18] *See Small v. McMaster*, 352 S.W.3d 280, 286 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (holding evidence that putative wife filed tax returns as "single" during years parties were allegedly married weighed against finding of common law marriage); *but see Leyendecker v. Uribe*, No. 04-17-00163-CV, 2018 WL 442724, at *5 (Tex. App.—San Antonio Jan. 17, 2018, pet. denied) (mem. op.)

(Tex. App.—San Antonio Jan. 17, 2018, pet. denied) (mem. op.) (holding that appellee held himself out as appellant's husband, "namely, by making written representations to two hospitals and accepting benefits as [appellant's] husband under her dental plan").

Randy dismisses his September 9, 2016 marital status affidavit as evidence of common law marriage because he executed the affidavit after the parties moved to Florida. Section 2.401 of the Family Code provides that an informal marriage may be proved by evidence the parties represented to others in Texas that the couple was married. TEX. FAM. CODE § 2.401(a)(2). The marital status affidavit states that Randy was single until his marriage to Mindy on August 12, 2016, and he sent that document to the title company in Texas for sale of the Olivia Lane property in Texas. Randy thus made a representation in Texas that he was married. Given that the document pertained to the sale of the Olivia Lane property in Texas and was relied upon by third parties in Texas,[19] we hold that the marital status affidavit was evidence of the parties' representation to others in Texas that they were married. *See Persons v. Persons*, 666 S.W.2d 560, 563 (Tex. App.—Houston

---

(holding that woman who represented to IRS that she was single was not estopped from claiming in unrelated lawsuit that she was common law married for year of tax return).

[19] Randy testified that when he signed the affidavit, he believed he was common law married as of August 12, 2016.

[1st Dist.] 1984, writ ref'd n.r.e.) (holding reference to party as "spouse" in credit application was evidence of holding out).[20]

We also conclude that Sadie Snow's and Loyce Huffman's testimony that Mindy told them in Texas that she was common law married to Randy was evidence of the "holding out" element.[21, 22]

Randy cites several cases in support of his "holding out" argument, but none of those cases involved the type of documentary evidence upon which the trial court relied, such the federal tax returns the couple filed as "married filing jointly" during the common law marriage and the marital status affidavit in which Randy asserted to a Texas title company that he was common law married to Mindy as of

---

[20] Representations that involve criminal liability are especially persuasive: "We find no appreciable difference between the acknowledgement of a deed and signed statements in a credit application which, if false, would expose the applicants to criminal penalties." *Persons v. Persons*, 666 S.W.2d 560, 563 (Tex. App.— Houston [1st Dist.] 1984, writ ref'd n.r.e.).

[21] Randy argues that Sadie was not told of the purported marriage while the couple was still in Texas. But Sadie testified that although she could not remember whether it was August or September 2016, she learned of the marriage before Mindy moved to Florida. *See Burden v. Burden*, 420 S.W.3d 305, 308 (Tex. App.—Texarkana 2013, no pet.) (observing trial court "may resolve inconsistencies in any witness' testimony").

[22] There is conflicting evidence as to whether Jason St. Bernard was told about the common law marriage when he traveled to Texas to help with the move to Florida. In reviewing conflicting testimony, we accord "due deference" to the trial court, which is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Gordon v. Gordon*, No. 09-05-330 CV, 2006 WL 5961831, at *6 (Tex. App.—Beaumont July 31, 2008, pet. denied) (mem. op.); *see also Weaver v. Preddy*, No. 04-18-00026-CV, 2018 WL 6331063, at *1 (Tex. App.—San Antonio Dec. 5, 2018, no pet.) (mem. op.) (noting trial court "may believe one witness and disbelieve others").

39

August 12, 2016. *See Mills*, 94 S.W.3d at 74–75 (holding affectionate behavior without more did not constitute "holding out" in the community);[23] *Walter v Walter*, 433 S.W.2d 183, 191–93 (Tex. App.—Houston [1st Dist.] 1968, writ ref'd n.r.e.) (holding there was no evidence couple lived together as married or publicly held themselves out as married for several months after agreeing to marry); *Danna v. Danna*, No. 05-05-00472-CV, 2006 WL 785621, at \*2 (Tex. App.—Dallas Mar. 29, 2006, no pet.) (mem. op.) (holding trial court did not err in granting putative husband's motion for directed verdict because evidence that included signed AARP form putative husband did not complete but that nevertheless identified putative wife as spouse, and promissory note and deed of trust that reflected joint property purchase but did not refer to couple as spouses, was no more than scintilla of evidence to raise fact issue on holding out element);[24] *Lee v. Lee*, 981 S.W.2d 903, 907–08 (Tex. App.—Houston [1st Dist.] 1998, no pet.) (holding testimony that woman told two friends she was married and others began to call her "Mrs. Lee" was insufficient evidence of holding out to public); *Small v. McMaster*, 352 S.W.3d 280, 287 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (holding contradictory evidence regarding whether couple held themselves out as married,

---

[23]   In *Mills*, one witness testified that she recalled being introduced to the couple as married six years after the alleged marriage began. *Mills v. Mest*, 94 S.W.3d 72, 74 (Tex. App.—Houston [14th Dist.] 2002, pet. denied).

[24]   In *Danna*, the putative husband proffered evidence of published legal notices that stated the couple was not married. *Danna v. Danna*, No. 05-05-00472-CV, 2006 WL 785621, at \*2 (Tex. App.—Dallas Mar. 29, 2006, no pet.) (mem. op.).

lack of evidence that couple had reputation in community as married, evidence man wanted to conceal purported marriage, evidence woman referred to herself as single on government, insurance, and credit documents, and other evidence "was contrary to [woman's] claim of an informal marriage").

Randy's reliance on *Luna v. Garcia* is particularly misplaced. In that case, the Fort Worth Court of Appeals held that a putative common law husband (Luna) had not raised a fact issue on the "holding out" element to avoid summary judgment on his petition for divorce based on the existence of a common law marriage. Luna sued Garcia for divorce, alleging they were married on March 18, 2002, and had lived together as spouses until August 14, 2020. 2023 WL 7400927, at *1. Garcia filed a motion for summary judgment arguing that the couple had never been married. *Id.* In support of her motion, Garcia attached tax returns that showed the couple had filed separate tax returns in which they identified their filing status as single between 2017 and 2019, two warranty deeds that described Luna as single, a bank statement showing Luna had a joint bank account with another woman, and an affidavit in which Garcia asserted, among other things, that Luna had been living with another woman and his children knew Garcia was not his wife. *Id.* at *4. Luna's summary judgment response attached only an affidavit in which he stated that he and Garcia "told other people [that they] were a married couple." *Id.* The trial court held such "isolated references" to the marriage

constituted "no evidence" of the holding out element and, therefore, did not defeat Garcia's summary judgment motion. *Id.*

The inverse is true here. The trial court concluded there *was* evidence supporting the "holding out" element as reflected by the marital status affidavit and the couple's federal tax returns, all of which reflected that the parties considered themselves married and represented themselves as married to the public and to governmental agencies.[25] *See Leyendecker*, 2018 WL 442724 at *5 (observing that "representations made to governmental entities regarding marital status" may be considered by trial court "as evidence either supporting or refuting a claim of informal marriage").[26]

Considering the evidence and inferences that support the trial court's determination that the parties held themselves out as married, we hold the trial court's finding was supported by legally sufficient evidence. As such, the trial

---

[25] *Cf. Quinn v. Milanizadeh*, No. 01–07–00489–CV, 2008 WL 1828327, at *5 (Tex. App.—Houston [1st Dist.] Apr. 24, 2008, no pet.) (mem. op.) (holding that keeping separate bank accounts and filing tax returns with single filing status did not negate existence of common law marriage but went to weight of evidence).

[26] In light of the "holding out" evidence described above, we are not persuaded by Randy's argument that Mindy's failure to change her status to "married" on Facebook or to take Randy's last name are indicia that she did not hold herself out as his spouse. Nor are we persuaded by Randy's argument that there was no "holding out" because the going-away party given for Mindy and Randy in July 2016 was not a celebration of their marriage or engagement. Both parties agreed that the subject of common law marriage was not broached until August 2016, so the party could not have honored the marriage or engagement, neither of which existed at that point.

court did not abuse its discretion to the extent it found Randy and Mindy held themselves out as common law married in Texas.

We overrule Randy's first and second issues.

## Conclusion

We hold the trial court did not abuse its discretion by holding that Mindy and Randy entered into a common law marriage on August 12, 2016.

We affirm the trial court's judgment.


Veronica Rivas-Molloy
Justice

Panel consists of Justices Hightower, Rivas-Molloy, and Farris.